**William L. CALLEY, Jr., Petitioner,**

v.

**Howard H. CALLAWAY et al.,
Respondents.**

**Civ. A. No. 74–7–COL.**

United States District Court,
M. D. Georgia,
Columbus Division.

Sept. 25, 1974.

George W. Latimer, Salt Lake City, Utah, J. Houston Gordon, Covington, Tenn., and Kenneth M. Henson, Columbus, Ga., for petitioner.

Charles T. Erion, Asst. U. S. Atty., Macon, Ga., S. Cass Weiland, Dept. of Justice, David P. Schulingkamp and Arnold Anderson Vickery, Edward C. Newton IV, Washington, D. C., for respondents.

## OPINION

ELLIOTT, Chief Judge.

### Background and Present Status of the Case

On March 31, 1971 Petitioner was found guilty by Army general court-martial of premeditated murder and assault with intent to commit murder in violation of Articles 118 and 134 of the Uniform Code of Military Justice. On February 16, 1973 the Court of Military Review affirmed the conviction. The Court of Military Appeals granted a limited review and on December 21, 1973 affirmed the Petitioner's conviction by a split decision. Having exhausted the appeal procedures provided in the military system, the Petitioner on February 11, 1974 filed a petition for writ of habeas corpus in this court praying that he be discharged from custody on the ground that his conviction is constitutionally invalid.

At the time of the alleged offenses which are the basis of the Petitioner's conviction Petitioner was 25 years of age and held the rank of Second Lieutenant. At that time he had been an enlisted man for approximately 14 months and had been a Second Lieutenant for about 6 months. He had completed his first tour of duty in Vietnam, but when a shortage of junior officers developed he voluntarily extended his Vietnam tour by an additional 6 months.

When he enlisted in the Army he was given the usual basic training and he later asked for and received a recommendation for Officer Candidate School and was accepted for a class starting in March, 1967. After he finished OCS he was assigned to the 11th Infantry Brigade in Hawaii where he was taught the usual infantry subjects and was specifically informed that he was required to give strict obedience to orders.

The Petitioner's first assignment in Vietnam was at Duc Pho. He had a short series of classes there and most of the instruction was given by ARVN instructors. This was his first indoctrination about the character of the potential enemy. He was told that women were as dangerous as men and that children were even more dangerous because they were unsuspected. He was also informed that the women were frequently better shots than the men and that the children were used to plant mines and booby traps. The first military operations in Vietnam in which he was engaged were those in which his unit was used for reconnaissance along trails and in seeking out and seizing enemy materials. During these missions the unit was continually subject to fire from unknown and unseen individuals. A number of men in the company had been killed or wounded and prior to the operation at My Lai Four they had never seen the persons responsible for the death or injury of their buddies. Consequently, they formed the opinion that civilians were in part responsible. Also prior to the operation at My Lai the unit had been used on some ambush missions and about the time of the TET offensive in 1968 the unit had suffered heavy casualties, 95% of which were caused by mines. During the course of an earlier operation one of the platoons of the company walked into a mine field with disastrous results. Without reciting details it can be said that the record shows a resentment by members of the command at the means and methods used by the Viet Cong and their sympa-

thizers to decimate the American units and kill American soldiers.

On March 15, 1968 the company was part of a task force identified as "Task Force Barker". This force was made up of three line companies selected from different units and placed under command of the task force headquarters manned by temporarily assigned officers. In the afternoon of that day there was a memorial service to pay respects to the men of the company who had been killed in battle. Immediately following the service the company captain, Captain Medina, assembled the company and briefed them on the operations of the following day. Generally speaking, he informed them that their mission was to attack and destroy My Lai Four and move on to other villages. They were to take extra ammunition and be prepared to fight aggressively and they were to be opposed by one of the best trained units in the Viet Cong Army. It was estimated that the enemy force would outnumber them by about two to one. Captain Medina further informed them that the reason the American troops had been driven out of My Lai on prior occasions was because the troops were not aggressive enough and enemy troops infiltrated to the rear of the units. Further orders by the Captain were to the effect that the troops would destroy the wells, burn the village and kill all living things. Captain Medina was asked by several of the enlisted men whether when he used the phrase "kill every living thing" he intended to include women and children. According to some of the witnesses his answer was "Yes, it means men, women and children" and that he did not want to see anything living when he came through the village. The record shows that Captain Medina admits having been questioned by enlisted men concerning the meaning of the phrase "kill every living thing" and he testified that he replied "I said, no, you must use common sense. If they have a weapon and are trying to engage you, then you can shoot back." As can be seen, these instructions were subject to some misinterpretation, but it is beyond doubt that the majority of those testifying believed that Captain Medina's orders were to kill every living thing in the village and this included men, women and children. The fact that Medina gave such an order is even more believable when it is considered that he participated at least to some extent in the shootings which followed. The military judge who presided over the trial of Petitioner certainly believed, and the record established, that the orders were given. Exactly what the order was is a matter that was hotly contested at the time of Petitioner's trial.

The plan of operation was that the unit would move to the village by helicopters in either two or three lifts. The Petitioner's platoon was to be flown in the first lift. The tactics decided upon were that when the troops exited from the helicopters they would "hit the ground" because the landing zone would be "hot". As soon as possible two platoons would form a line and reconnoiter forward by fire. The first and second platoons were assigned to be the assault units and the third platoon was to be in reserve. The troops were to be aggressive and this would be an opportunity to "get even" with the enemy and to take revenge for recent heavy casualties.

On the following morning, March 16, 1968, the troops approached the village as planned. This was their first assault and a number of the men were replacements brought in just prior to combat, never having had any combat experience and not having participated in any rehearsals of assault under controlled fire. When the two platoons started forward the men commenced firing and they went through the village killing all animals, burning the hootches, and destroying food and water. During the ensuing operation there were civilians being killed by the members of all three platoons and confusion was everywhere apparent. This could be expected for Captain Medina claims to have occupied his command post on the perimeter of the village and remained there approximate-

ly two hours, believing that the firing was coming from the enemy. The village was described as about the size of a baseball field and there were some 100 American troops operating through its area. The company was under strength and Lt. Calley's platoon had many of its technicians missing, and this required substituted assignments. It was,. therefore, necessary just before battle for him to assign a number of his enlisted men to new positions and arm them with weapons new to them and they were not proficient in the use of the new weapons.

About 18 months later, just one day before Petitioner was due to be discharged from the Army at Fort Benning, Georgia, charges were preferred against him. He later went to trial on four specifications which charged him with the murder of more than 100 occupants of the village of My Lai, the alleged victims not being identified by name, age or sex. By the time charges were brought against Calley most of the members of the company who participated in the assault at My Lai were no longer in the Army and, therefore, not subject to court-martial. The Army subsequently brought charges against some additional individuals who still remained in the Army, but all of these other cases were either later dismissed or the defendants were promptly acquitted. Of all those present at My Lai on March 16, 1968, only the Petitioner was convicted.

The Petitioner contests the validity of his conviction on a number of grounds, but the Court considers only three of these contentions to be of constitutional dimension and, therefore, appropriate for consideration by this Court on review. These contentions, which will be considered in the order listed, are as follows:

(1) The contention that the Petitioner was denied a fair and impartial trial because of massive adverse pre-trial publicity.

(2) The contention that the Petitioner was denied his right of confrontation with witnesses and was denied compulsory process for obtaining witnesses in his favor.

(3) The contention that the Petitioner was denied due process by being convicted on charges and specifications which were improperly drawn and illegally used by the prosecution.

The Court has had the benefit of counsel's extensive briefs and oral arguments, and has made a complete review of the transcript of the record in the case, which consists of more than 5,000 pages, and has made a detailed examination of the mass of trial and appellate exhibits, which in themselves comprise 50 volumes containing more than 15,000 pages, and has viewed numerous television tapes, and now files this opinion as contemplated by the requirements of the Federal Rules of Civil Procedure.

## I.

### *The Pre-trial Publicity Issue*

The Petitioner was accused of participating in a "massacre" and the charge was levied as being one of murder. It was referred to trial as a capital case. It is in this context, therefore, that the determination whether the Petitioner received a fair trial in light of the pre-trial publicity must be viewed.

Our nation's courts have long acted to protect the individual accused from the harmful effect of unrestrained and uncontrolled news coverage. In 1892 the Supreme Court stated:

"It is vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate unbiased judgment. Nor can any ground of suspicion that the administration of justice has been interfered with be tolerated."

Mattox v. United States, 146 U.S. 140 at 149, 13 S.Ct. 50 at 53, 36 L.Ed. 917 (1892).

The individual's right to a fair trial, whether it be in a civilian court or in a

military court, must in the constitutional sense imply at the very least that the " 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel". Turner v. Louisiana, 379 U.S. 466, 473, 85 S.Ct. 546, 550, 13 L.Ed.2d 424 (1965). It matters little whether the unfairness that inures to the detriment of the hapless defendant results from the inability of the court which tries him to protect him from the prejudicial effect of the publicity or from the non-exercise of whatever power the court may have; the result is the same. It matters not whether the fallible venire men, be they military or civilian, are bombarded by press, radio, and television reports detailing the evidence and establishing the guilt of the accused as a result of the *lack* of power vested in the judicial body trying the accused or as a result of the *non-exercise* of the power held by the judicial officer. A conviction secured, in whole or in part, by use of information so secured "obviously constitutes a denial of due process of law in its most rudimentary conception". Irvin v. Dowd, 366 U.S. 717 at 729–730, 81 S.Ct. 1639 at 1646, 6 L. Ed.2d 751 (1961), *concurring opinion of Frankfurter, J.*

Never in the history of the military justice system, and perhaps in the history of American courts, has any accused ever encountered such intense and continuous prejudicial publicity as did the Petitioner herein. Virtually every newspaper, periodical, magazine, television station, radio station, and every other news medium carried continuous and extensive interviews, reports, pictures, articles, statements, quotes, and editorial comments concerning the Petitioner's role in the so-called My Lai incident.

An examination of the publicity itself, the actions taken (and not taken) to protect the Petitioner's individual right to a fair trial, the lack of power inherent in the military judge and in the military system itself to protect that right, the lack of cooperation on the part of the United States Department of Justice in enforcing the judge's orders, the inherently prejudicial nature of the publicity itself, and the ineffective nature of the protective restraints placed on witnesses and jurors prior to the court-martial lead me to the inescapable conclusion that the Petitioner was denied a fair trial as required by our nation's Constitution. Stated otherwise, I find that the Petitioner was denied a fair hearing at his court-martial, not only because of the inherently prejudicial nature of the publicity to which the triers of fact were exposed, but because certain inherent defects in the military system which tried him existed, making it impotent to protect the Petitioner from the prejudicial publications.

On September 5, 1969 the Petitioner was charged with the murder of civilians as a result of the My Lai incident. There was a short initial period during which there was little or no media coverage of the charges against the Petitioner. However, on November 13, 1969 an article by Seymour Hersh triggered an avalanche of publicity concerning the incident and the Petitioner's role therein. Within a period of a few days virtually every form of news service in the country, and indeed in the world, had deluged its hearers, viewers and readers with extensive and intensive coverage of the Petitioner's plight. Not only was this publicity so inherently prejudicial as to require reversal, but the court-martial system itself had no means by which it could protect the Petitioner's right to a fair trial.

In the military justice system there is no continuously sitting judicial officer who may act to protect the rights of the individual accused. Unlike the civilian system, in the military system there is no judge with the judicial powers to protect the individual until the case is *referred to trial* by court-martial. Under the Uniform Code of Military Justice there is *no court* until a convening authority convenes the court-martial and details a military judge. Before an ac-

cused's case is *referred* to trial there must be a *preferral* of charges and an investigation. The investigating officer makes a recommendation as to the disposition of the case. Only after this recommendation and review by the convening authority's legal officer does the convening authority *refer* the case to a general court-martial and *only then* is a court of special jurisdiction created. The convening authority refers the case to a court-martial convened by a "court-martial convening order" in which he has selected the court members, the triers of fact, the prosecutor, the detailed defense counsel, and the military judge. Thus a situation is created where an individual stands accused of a crime but there exists no judicial officer to whom he may turn for protection of his right to a fair trial until a later time when the charges are referred to trial by court-martial. In Petitioner's case, during this period of time between preferral of the charges against him and the referral of the case with the concomitant appointment of a military judge, much of the highly prejudicial matters were first broadcast and published by the media. During this time Petitioner was without the means to protect himself, through no fault of his own, but because the military system did not provide a judicial officer to protect him. The impact of the publicity released during this period when there was no military judge cannot be doubted.

Calley was originally painted as a "mass murderer" involved in the unlawful killing of some 567 Orientals which number included men, women and children. The newspaper articles and television interviews quoted prospective witnesses and stated factual and legal conclusions. Some of the more common phrases used by the news media in describing the My Lai incident included the following: "massacre", "atrocity", "slaughter of non-combatants", "dozens of women and children shot down in cold blood", "wanton killing", "an act of brutality that cannot have been exceeded in

Hitler's time", "unjustified killing of innocent civilians", "a barbaric act". Calley himself was described as everything from a "mass murderer" to a "ghoul". Set out below are some newspaper headlines which were typical of the treatment given the matter in its early stages:

VIETNAMESE SAY GI's SLEW 567 IN TOWN

U. S. OFFICER IS ACCUSED OF MASS VIET MURDERS

LIEUTENANT A MYSTERY— CHARGED WITH MURDER

ARMY PROBING CHARGE GI KILLED 109 IN VIETNAM

POST LIEUTENANT CHARGED WITH MURDERING VIETNAMESE

GI MURDER REPORT IS PREPARED

VILLAGERS SLAIN. HOW MANY? BY WHOM?

LIEUTENANT'S PRAISE TURNS INTO PROBE

EX-GI's LETTER ACCUSES OFFICER

CONGRESSMEN URGE PROBE INTO VIETNAMESE MASSACRE

LIEUTENANT FACES MASSACRE TRIAL

SHOCK IS EXPRESSED AT MASSACRE REPORT

THE MY LAI SLAUGHTER

WHAT ARE MASSACRE FACTS?

MY LAI DEAD—400 NAMES

LETTER PUTS MY LAI TOLL AT NEAR 600

The national television networks demonstrated an eagerness to interview prospective witnesses in the Calley case on their news broadcasts and elicit from them all types of statements, much of which was pure hearsay, but all of which was devastating to Calley.

The NBC Huntley-Brinkley Report of November 21, 1969 included an interview with former GI Michael Terry.

The following exchange was an integral part of the interview:

"Q. Did you see any of the civilians lined up or stood up against a building or anything like that and shot?

TERRY: No, I didn't see this. I had a friend that—that told me about this one incident with this Lt. Calley. And he ordered one man—I believe his name was Torres—to shoot these—he gave him a machine gun and he ordered him to shoot these people and he shot about half of them, and he wouldn't do it any more, so Calley grabbed the machine gun and shot the rest of them."

This is clearly hearsay and would not be admissible in any court.

Another example of this type of hearsay was broadcast during the NBC Huntley-Brinkley Report of November 17, 1969, which featured an interview with former soldier Ronald Weigner, who related stores told to him by alleged participants at My Lai:

"WEIGNER: They told me that they had moved out from their base camp one morning early late in March, and that they had moved to this village that the GI's referred to as Pinkville, and that they had gone through and massacred the villagers, wiped out everybody.

Q. Specifically, what kind of thing were you told about?

WEIGNER: Specifically, they told me that they had seen individuals, individual soldiers, and some of the officers, going through the village and as they swept through the village if there were people standing by the side by the trail through the village, they just gunned them down."

On November 17, 1969 the Columbia Broadcasting System TV evening news interviewed ex-GI Ronald Ridenhour, the individual whose letters containing hearsay allegations led to the Army investigation into the My Lai incident, and in response to the news correspondent's question concerning what he had charged in his letters to members of the Government, Ridenhour responded:

"As specifically as I can tell you, the charges were that an American line company had swept through this village and that there were a great, great number of inhabitants of the village who were murdered, who were slaughtered or massacred or killed, whatever, without provocation."

Of course, the daily newspapers also interviewed Ridenhour and in the newspaper interviews Ridenhour actually named Lt. Calley as being one who was involved in the incident which Mr. Ridenhour characterized in the same breath as being "murder", "slaughter" and "massacre".

The desire of news representatives to publish statements of prospective witnesses took them to Viet Nam, where they interviewed "survivors of the assault on My Lai Four". On November 18, 1969, the American Broadcasting Company TV evening news reported that inhabitants of the hamlet near My Lai had been interviewed by their representative and that they had stated that 567 civilians were killed without provocation, and the newscaster stated that statements from these survivors had been taken live from the inhabitants on the scene. These interviews, in which Calley's name was freely bandied about, were conducted by the TV anchorman in front of a large map of Vietnam on which blotches of blood appeared, obviously for the purpose of accentuating the horror of the story.[1]

The CBS news broadcast of the same date reported similar stories including live interviews with the Vietnamese "witnesses" who claimed to be survivors. Since the Vietnamese who were inter-

---

1. This television network used this same blood-horror visual technique on subsequent broadcasts.

viewed spoke no English, the news correspondent told his audience "what the witnesses had said". He told his audience that one of these survivors was a man 48 years of age and that the man "had said" that the Americans came to his village three times:

> "Two times they gave candy to the children and the villagers gave the soldiers water. But the third time, he explained, the Americans moved everybody out of their homes, lined them up in groups and opened fire on them. He said he survived because he was under a pile of bodies and was taken for dead."

The interviewer then went on to say that this "witness" said he knew of no reason for the shooting and the villagers were unarmed and had not provoked the Americans.

The National Broadcasting Company TV news of the same date carried similar stories and similar interviews of those who allegedly had survived the My Lai incident and who, the correspondents said, gave details about "what they knew" about the incident which the correspondents in turn related to the TV audience.

The newspaper correspondents were, of course, not being outdone by television, and they found their own "witnesses" and quoted what their "testimony" would be if called to testify. Some typical newspaper headlines at this stage having to do with this feature are set out below:

SAW GI's GUN DOWN 100—VILLAGE SERGEANT SAYS

SERGEANT SAYS HE SAW CIVILIANS SLAIN

PEASANT FARMER RECALLS DAY OF THE MASSACRE

SURVIVORS CLAIM US TROOPS KILLED OVER 300 VIET VILLAGERS

THREE VETERANS TELL OF HAMLET SLAYINGS

PEASANT TELLS HIS VERSION OF SLAYINGS

VILLAGE SHOT UP BAD

ONLY CHICKENS LEFT ALIVE

VIET SOLON SAYS WOMAN SAW MASSACRE

THE PINKVILLE CURE

GI's NEEDLESSLY KILLED 450, SAIGON REPRESENTATIVES SAY

VIET VILLAGERS CHARGE GI'S "MOWED US DOWN"

MY LAI SURVIVORS RECOUNT THEIR STORIES OF GI SWEEP

GIRL DESCRIBES FINDING KIN DEAD AT MY LAI

By mid-November, 1969 Ronald Haeberle, a former Army photographer, had copyrighted and sold for $19,500 some pictures to Life Magazine which were alleged to represent views of the "dead bodies" at My Lai. Mr. Haeberle made an additional $35,000 by sales of his pictures to Time Magazine and certain newspapers and overseas publications. These horrifying full-page color pictures were published in gruesome detail by Life and later by many newspapers and other periodicals both in this country and throughout the world, and Calley's name and the fact that he was facing court-martial was frequently mentioned in connection with them. On November 20, 1969 these pictures were displayed by CBS-TV news along with comments by newscaster Harry Reasoner. Each photograph was displayed in close-up detail, and to increase the shock effect of the display there was absolute silence while the pictures were on the TV screen. On that same date NBC-TV likewise dealt with the Haeberle photographs. *Some of these pictures were the very exhibits which were later used by the prosecution in the Calley trial and constituted some of the most damaging evidence presented by the prosecution.*

Thus, we have a situation where the prosecution's evidence is being broadcast, published and displayed to the world (including all prospective jurors) before there is even a court constituted for the trial.

As might be expected, following the publication of the Haeberle photographs there was an outpouring of expressions of indignation by news commentators, editors and public figures. Some typical newspaper headlines of the date are set out below:

LIFE BUYS PICTURES OF SLAYING

MASSACRE COMPARED TO NAZI MURDERS

MOB BURNS US FLAG IN LONDON

PINKVILLE SYMBOLIZES BRUTALISM

CAN'T CONDONE MURDER

BRITAIN MAY CONDEMN US IN MASSACRE

"SHOCKED AND SICK" OVER MY LAI

GRIMLY, THE EVIDENCE MOUNTS

"ABHORRENT" TO THE US

WHAT KIND OF PEOPLE ARE WE ANYWAY?

MASSACRE ATTACKED BY CLERGY

RIVERS CALLS CHARGES "ONE OF DARKEST DAYS IN MILITARY HISTORY"

THE COURT-MARTIAL ISN'T ENOUGH

JUST SPEED THAT TRIAL!

On November 24, 1969 the Columbia Broadcasting System presented a TV and radio "in person" interview with Paul Meadlo who said that he was one of the troops present during the My Lai incident. Meadlo later appeared as a prosecution witness at Calley's trial and was probably the most damaging witness to appear against him. On this TV and radio appearance he rehearsed for the viewers and listeners (including all prospective jurors) what his testimony would be. The following is a portion of what he said during the interview:

"So we moved on into the village and we started searching out the village and gathering up the people and running them to the center of the village.

Q. How many people did you run up?

A. About thirty-five or forty-five people gathered in like I say, the center of the village, and we placed them in there and it was like a little island in the center of the village, I say.

Q. What kind of people? Men, women, and children?

A. Men, women, children,—

Q. Babies?

A. Babies.

And, we all huddled them up and made them squat down and *Lieutenant Calley came over and said you know what to do with them, don't you? And I said yes. So I took it for granted that he just wanted us to watch them and, he left and came back about ten or fifteen minutes later and said how come you ain't killed them yet, and I told him that I didn't think he wanted us to kill them that he just wanted us to guard them. He said no, I want them dead.*

Q. He told this to all of you or you in particular?

A. Well, I was facing him but the other three or four guys heard it. *So, he stepped back about ten or fifteen feet and started shooting and he told me to start shooting and so I started shooting and I fired about four clips into this group.*

Q. Four clips from your—

A. M–16.

Q. And, there is about—

A. I carried seventeen rounds to each clip.

Q. So, you fired something like sixty or seventy shots? And you kill how many?

A. Well, I just sprayed the area with my automatic. You don't know how many you kill because it come out so doggone fast. I might have killed ten or fifteen of them.

Q. Men, women and children?

A. Men, women and children.

Q. And babies?

A. And babies."

(Emphasis added.)

The Meadlo interview became hot property among the news media and similar interviews of Meadlo were broadcast on other networks. Some of the newspaper headlines following the Meadlo interview were as follows:

FORMER GI TELLS OF KILLING VILLAGERS

FORMER PRIVATE: HE SAID KILL, NOT GUARD

UNIT TOLD TO DESTROY, EX–GI SAYS

ANOTHER EX–GI REPORTS SHOOTING

THEY WERE THERE—SAW FURY IN VIET NAM

A few days after the Meadlo interview CBS TV news presented a live interview with another prospective prosecution witness, a Sgt. Bernhardt, who described everything that he said happened at My Lai, and here again the Haeberle color photographs were displayed during the interview and specific reference was made to Calley, calling him by name. Sgt. Bernhardt's "testimony" was also widely reported by the press.

Other persons who claimed to be "eye witnesses" were also shown on television [2] and quoted in the press, some of whom did not later appear at the court-martial of Petitioner. For example, Charles Gruver, one of the witnesses Calley sought to subpoena as a defense witness for his trial, gave an interview to the press and he was the man who was named by Ridenhour as being the source of some of his hearsay information, yet Calley's attorneys were unable to secure Gruver's testimony at the trial because of the Army's alleged "inability" to secure his presence.

There was mounting criticism of the news media for interviewing prospective prosecution witnesses and broadcasting their testimony [3] and in response to this criticism the Columbia Broadcasting System, on November 25, 1969, stated that the "free press—fair trial issue [raised by its critics] does not apply because Lt. Calley will be tried, not by civilian jury but by a military court". This naive assertion presupposes that simply because a man wears an Army uniform he is not subject to being influenced by pre-trial publicity as would a civilian. Indeed, in the circumstances of this case where it appears (as will be later shown) that some of the most damaging of the pre-trial publicity consisted of statements and pre-judgments being made by persons occupying high positions in the military command, including the Commander in Chief himself, it could be more reasonably supposed that members of the Army who would later constitute the trial jury would be *more* susceptible to prejudicial publicity than would their civilian counterparts.

While the television networks were almost daily presenting a new prosecution face who pointed the finger at Calley the newspapers were giving generous

---

2. A total of ten such "witnesses" were interviewed on the TV networks.

3. Senator Dominick in the Senate and Representative Taylor, of North Carolina, in the House of Representatives, had made critical speeches. Representative Taylor in addressing the House had said:

"[T]his young man has been tried and convicted—not in a court of law, but by the press. This case has been horribly handled, both by the Army and the news media. Lt. Calley's constitutional rights have been violated, as witnesses have been interrogated by news reporters and their testimony published nationwide. These constitutional rights have been violated by the publication of revolting pictures of horror and death with cutlines leaving the impression that such was caused by this Lieutenant."

coverage to their statements and were digging up witnesses of their own.

On November 17, 1969 the New York Times News Service interviewed an alleged survivor of the My Lai incident and distributed to newspapers throughout the country the man's story of what he said happened at My Lai in great detail. The name of Calley was prominently mentioned during the course of the interview and the newspaper account concluded by stating that when this witness was informed that the United States Army was prosecuting Calley for murder the witness said that he "stood ready to go to the United States to testify at a court-martial". The clear implication of this was that the witness was to testify against the Petitioner and was willing to do so and that the statement published was what his testimony would be. The fact is that the witness did not appear at the court-martial and we suppose this was hardly necessary since all prospective jurors had already had the benefit of his testimony.

Of course, the news magazines did not overlook the opportunity to add to the hue and cry. As each week passed these publications reported, reviewed, rehashed, resummarized, recapsulated and repeated everything that had come out the previous week by way of television, newspapers, or simple street corner gossip, and always the name *Calley* was the center of attention. For instance, Newsweek Magazine in its issue of November 24, 1969 published a story about what had been developed about the My Lai incident and the title of the article was *"The Calley Case"*, and underneath that main heading there was a subheading which read "War crimes are as old as human combat".

Prominent Members of Congress were eager to publicly associate themselves with the prosecution and give hearsay evidence which was repeated in the press. On November 25, 1969 representative Lionel Van Deerlin stated that:

"According to my informant, that the next village they reached they would get some target practice."

He termed the assault at My Lai "a case of unprovoked attack". In a speech in the United States Senate Senator Young called the acts at My Lai "murders". Also in the Senate, Senator Schweiker described the incident as "a simplistic, deliberate act of inhumanity—one of the darkest days in American history". Since Calley was the one who had been charged it was not difficult for the public to relate these remarks to the Calley case.

On November 26, 1969 Secretary of the Army Resor appeared before a Congressional committee and it is interesting to observe that in his remarks to them he started out by saying:

"As you know, it is not *normally* the policy of the Executive Branch to disclose information pertaining to ongoing criminal investigations . . . especially when, as in the case here, new and perhaps conflicting evidence may come to light as the investigation continues. In addition, there has already been far too much comment in the press on matters of an evidentiary nature, and we are very concerned that prejudicial pre-trial publicity may make it difficult to accord the accused in any prosecution a fair trial." (Emphasis added.)

But having so said, the Secretary then proceeded to tell the committee all about the details of the alleged incident and even exhibited picture slides, etc., for the edification of the committee and told the committee that the Army intended to prosecute. This was on the day after the Army court-martial was first convened for the consideration of the Calley case and, of course, his recital received wide publicity at the same time the first convening of the court was being publi-

cized. In reporting Secretary Resor's comments a typical newspaper headline the following day was as follows:

## VIET DEATH SLIDES STUN COMMITTEES

On that same date, November 26, 1969, in a news conference at the White House Press Secretary Ziegler in a press interview, specifically stating that he was speaking for the President of the United States, made the following pronouncement:

"An incident such as that alleged in this case is in direct violation, not only of U. S. military policy, but is also abhorrent to the conscience of all the American people. . . . Appropriate action is and will be taken to assure that illegal and immoral conduct as alleged be dealt with in accordance with the strict rules of military justice."

Also on that date Mr. William P. Rogers, Secretary of State, was interviewed on a national television network and when asked about "the alleged massacre of Vietnamese civilians" made this comment:

"I think that if the allegations are true it is a shocking, shocking incident and all we can do is to court-martial any responsible persons and to show the world that we don't condone this. Obviously, if anything of this kind happened, it is in direct contradiction of the orders . . . It is a tragic event, if it is true. And certainly there is indication of some truth at least. So we are highly concerned; it is a shocking thing."

Obviously, since Calley was already being court-martialed Rogers was saying that he considered Calley a person responsible. And then he accentuates that by expressing his opinion that there is truth in the allegations made against Calley.

The first date on which the military judge had authority to sit and take any action in the Calley case was November 25, 1969, and although it is fundamental in our American system of justice that a defendant is to be presumed innocent until proven guilty by competent evidence in a valid court proceeding, there were many representatives of the news media who were by that time telling the American public (including all prospective jurors) that the "facts" as developed by the news media and published by them had overcome that presumption, and indeed, that they would be justified in presuming that Calley was guilty, some even insinuating that to give the man a trial would be sort of a superfluous act.

The Chicago Tribune commented editorially on November 29, 1969:

"The My Lai atrocity charges have not been proved, altho the *presumption of guilt* is great." (Emphasis added.)

In his nationally syndicated column published in many newspapers throughout the country on December 4, 1969, James J. Kilpatrick said:

"The damning facts are now unfolding one by one. It is tempting to say that "we don't know" what happened at My Lai that day in March, 1968. True; but true only in a lawyer's eye."

Newsweek Magazine had this to say in its edition of December 15, 1969:

"*Deliberate massacre* of scores of women, children and old men by American soliders in a South Viet Nam hamlet? Impossible. Unbelievable. But the grisly photographs, the many interviews with eye witnesses, the memoirs of participants *command belief*. There is no place to hide from evidence that it happened." (Emphasis added.)

What Newsweek was saying here is that the photographs and the interviews of prosecution witnesses and the memories of participants, all of which had been published by the news media, prove the prosecution's case, because "deliberate massacre" is what was charged.

On December 2, 1969 the Atlanta Constitution said editorially:

"But the main facts of the incident, based on actual photographs and reports from individual soldiers on the scene, are not really in dispute."

On November 26, 1969 the New York Times News Service distributed the daily column of James Reston, in which he said:

"The main facts of this tragedy are not in dispute . . . so there is a question which is now going to the military courts. Is Paul Meadlo, of Terre Haute, Ind., this tragic and limited human being to blame? Or William L. Calley, Jr., the hard-faced lieutenant, who gave the orders?"

Since Meadlo never had charges brought against him we are not left with much choice.

Finally, we believe that the Montgomery Advertiser in its issue of December 4, 1969 made an honest appraisal of the situation when it said:

"We are inclined to the view that Lt. Calley has been tried and found guilty in news accounts."

In summary, the American public (including all prospective jurors), and indeed the entire world, had by that time been so impregnated with the thought of Calley's guilt that it could well have been assumed that all that would be necessary would be for the court-martial to convene and for the Judge to announce: "Bring the guilty rascal in and we will give him a fair trial."

The avalanche of prejudicial pre-trial publicity in this case and the dangers inherent therein were recognized by the military judge on the first day on which the court was empowered to sit, November 25, 1969, and he made a finding on that date that the news media had so widely publicized the alleged events and the statements of witnesses that there was a "clear and present danger" to the constitutional right of the Petitioner to a fair trial and due process of law, and on that date, in an unusual motion, both the prosecution and the defense joined in asking for the issuance of a show cause order to segments of the news media prohibiting further disclosure of statements made by any individual allegedly connected with the My Lai incident. This joint motion recited that:

"This motion is based upon the repeated and unprecedented newspaper, television, radio and periodical accounts and pictures purporting to represent evidentiary accounts of alleged witnesses to the case now pending before this court and representing a clear and present danger to the constitutional and inherent rights of 1st Lt. William Calley, Jr. to a fair trial under the Fifth and Sixth Amendments to the United States Constitution, and to his right to restrict prejudicial news reporting under the Ninth Amendment of the United States Constitution, to the rights of the United States Government to a fair trial and to the rights of both parties to enjoy military due process of law."

Numerous newspaper clippings, summaries of television broadcasts, and other evidentiary items, were submitted in support of the motion. The military judge denied the motion and stated:

"I frankly believe that the responsible news media are capable of policing their own activities." [4]

During this hearing on November 25 the military judge in a futile attempt to protect the Petitioner from prejudicial publicity did order all prospective witnesses not to discuss their testimony or to disclose any other evidence to anyone except counsel in the case or in related proceedings. However, he did this fully realizing that he did not have the power to enforce those orders. In fact, his or-

---

4. That they were capable of doing so is not denied. That they did not do so has been and will hereafter be made clear.

■■■■■■

ders were repeatedly violated.[5] He also issued an order to the prospective court members (jurors) instructing them to avoid contact with media reports of the My Lai incident and to refrain from discussing the case. Unfortunately, only one of the six members who eventually sat on the court as jurors was subject to this order since the other five members were detailed one year later by the convening authority.[6]

Three days later in another pre-trial hearing the military judge took note of the fact that he had evidence before him of wilful violations of the order which the court had issued to witnesses not to allow themselves to be interviewed and of the fact that representatives of the news media were enticing witnesses to do so, but he then proceeded to say that:

"1. The possibility of prejudice to this defendant's constitutional rights to a fair trial is real and apparent.

"2. It is recognized . . . that the courts-martial system is a federal jurisdiction, but it is not a part of the federal judiciary system.

"3. Thus as a matter of law this court does not possess the pre-trial power of contempt or any other judicial remedy to enforce the mandates of the United States Supreme Court as that court provided in Sheppard v. Maxwell, 384 U.S. 333. [86 S.Ct. 1507, 16 L.Ed.2d 600]"

He then observed that he thought he had done everything within his power to safeguard the rights of the defendant and he concluded his findings by saying that in view of the alarming situation:

" . . . counsel are directed to seek appropriate relief from a court within the federal judicial system or elsewhere as deemed necessary."

A joint petition was filed by the prosecution and defense counsel with the United States Court of Military Appeals, but the relief prayed for was denied by that court on the basis that the trial judge "could protect the petitioner".

On December 8, 1969 the military judge, over defense counsel's objection, ruled that the publicity surrounding the Petitioner's case had subsided and he thought the danger to a fair trial was past. This determination was made in spite of the fact that defense counsel presented evidence showing further interviews with witnesses on television, on radio and in the newspapers. It will clearly appear hereafter in this opinion that there was in fact *no* relaxation of the news coverage or of the danger and prejudice it brought to bear on the Petitioner's case. When defense counsel introduced exhibits showing recent public statements made by the President and other members of the Defense Department the military judge stated "But I couldn't stop that". It is made obvious by the military judge's own admission and by everything else in the record that his efforts to control witnesses and media between the dates of November 25, 1969 and December 8, 1969 availed nothing and is a perfect demonstration of the impotence of a military judge in the military system when civilian outsiders and authorities senior to the military judge within the military system decide to publicize matters which are prejudicial to an accused.[7]

---

5. "More honour'd in the breach than the observance." Shakespeare, *Hamlet.*

6. The remaining triers of fact were not detailed until November 13, 1970, a year later, when additional members were needed after challenges during voir dire had exhausted the initial panel and alternate panels of jurors.

7. The Petitioner has not questioned nor does this Court question the sincerity of the military judge. However, these efforts were ineffective; his orders were all bark and no bite, and necessarily so, because by law his orders had no teeth. The contempt power of the court-martial judge is limited to punishment of an act of contempt occurring in the presence of the Court. For example, even though process may issue to compel civilian witnesses to testify and to compel the production of other evidence as in the federal civilian courts, any violation of such a subpoena or order must be prosecuted by the Justice Department in the Federal Courts. See Articles 47 and 48 of the Uniform Code of Military Justice.

On December 16, 1969 the military judge again determined that some potential prosecution witnesses were violating his orders by granting interviews, and again he proclaimed that he was helpless to protect the Petitioner as could be done by courts in the federal judicial system under the *Sheppard* mandate. But he did direct trial counsel to notify the Justice Department of the violations and ask the assistance of the Justice Department in enforcing his orders to prospective witnesses. Trial counsel did, on December 17, 1969, follow the direction of the military judge and wrote to then Attorney General Mitchell, calling the Attorney General's attention to the orders which had been issued by the trial judge concerning disclosure of evidence and calling his attention to the fact that it was clear that the judge's orders were being violated by certain witnesses and by certain segments of the news media, and enclosing with the letter matters in support of the allegation that the violations were occurring. The letter stated that these matters were being called to the Attorney General's attention because of the military judge's lack of authority over civilians and with the request that the Attorney General initiate possible prosecutions by the Department of Justice in order that Calley's rights to a fair trial would not be jeopardized, etc.

Not only did the Attorney General fail to take any action whatever, *he even neglected to acknowledge receipt of the communication from the military court.*[8]

So, the media continued on their merry way.

On November 28, 1969 Ronald Haeberle appeared as a guest on the "Today Show", which is a daily early morning television network presentation. Haeberle was interviewed by Hugh Downs and during the course of the interview Downs displayed all of Haeberle's pic-

tures in color with comment, these being the same pictures which were concurrently appearing in that week's issue of Life Magazine. Here is part of the interview which the public had with breakfast on that date:

DOWNS: Now, the pictures that you took here, these are women and children?

HAEBERLE: Yes.

DOWNS: You said they were shot?

HAEBERLE: They were shot immediately after I took that picture.

DOWNS: Here is a picture now of a row of bodies. You said you saw more than one instance of this?

HAEBERLE: Yes.

DOWNS: Did you take any pictures of American G.I.'s shooting?

HAEBERLE: I believe I did but that would have been on the black and white film which I turned in to the Public Information Office when I returned back from this operation.

 . . . . . .

DOWNS: The caption here describes a boy falling on a smaller boy to protect him. They both wound up dead?

HAEBERLE: Yes.

DOWNS: These and the old man?

 . . . . .

DOWNS: This is another page of pictures. This is certainly not breakfast material.

 . . . . .

DOWNS: And, here again, what would be the feeling that someone this age could be a Viet Cong? (pointing to a picture of a small boy)

HAEBERLE: Well, there was an older man with these two small children. When the G. I. opened up

---

8. But when a civilian witness who had been subpoenaed to testify *against* Calley failed to comply, as the prosecution thought he should, the Justice Department *promptly* initiated criminal proceedings in aid of the military court. See United States v. John Sack, U.S.D.C. for the Middle District of Georgia, Columbus Division, Cr.No.5514 (1971). So, it would appear that with the Department of Justice "justice" was a one-way street where Calley was concerned.

and fired the bullets naturally cut down the small children also. There was no attempt made to just hold them and interrogate them. They were just automatically shot.

. . . . . .

DOWNS: You are telling me that you saw this happen but did you—did you photograph any G. I.'s actually shooting—do you think any of that is on the black and white roll, where actual—the actual act was—

HAEBERLE: I believe I did shoot a few shots from behind the G. I.'s shooting straight ahead.

. . . . .

DOWNS: Do you think, Ron, that this is an isolated incident or do you think it is representative of something that has been going on in Vietnam?

HAEBERLE: I have heard instances where things have happened like this before but not on the scale like this.

DOWNS: What do you think would be the outcome—do you care to conjecture on what the net result will be, if there is a trial? The specter has already loomed whether or not the publicity on it would affect the rights of the accused. Is this going to inhibit your talking about it in any way?

HAEBERLE: No, I don't think it will unless the Government asks me to keep quiet about this.

DOWNS: The Government has not done so yet?

HAEBERLE: Not yet, no.

DOWNS: Thank you for being with us this morning.

Ron Haeberle is the photographer whose color pictures now appear in this week's Life Magazine, the December 5th issue.

Thank you for appearing with us.

It will be noted that the military judge's order had been issued three days before this interview, yet it was obviously having no effect.

On December 1, 1969 the American Broadcasting Company continued its intensified coverage by reporting on its network the allegations of another alleged survivor-witness of the incident. The correspondent, Don Baker, who was pictured as reporting from Vietnam stated:

The man who first told me about the incident at My Lai is not here today. For some reason he was called back to province headquarters. No one knows why. But Ha HeQui (phonetic spelling) was also there at My Lai that day nearly two years ago. Ha HeQui is forty-four. She looks sixty-four. Ha HeQui's twenty-four year old daughter died there and her son had a part of his hand shot away. Ha He-Qui was shot in the head. She said it was the American soldiers that shot them.

Then an interpreter said:

She doesn't know why. They just called them to come and sit down and they sat down, including a monk, there was a monk there and they began to shoot them all.

The correspondent goes on to interview other people who allegedly say that they saw the "massacre" occur, including one boy who says he saw all of the members of his family dead. The correspondent sums up the story this way:

All the people of My Lai tell the same story, that their hamlet was destroyed deliberately by Americans. This, they say, is one of the graves of one of the victims of the alleged My Lai incident. There are five graves here. Scattered all around there are many more. But it has been two long years and nature has reclaimed, as you can see. Two years is a long time in South Vietnam.

On this same date the Columbia Broadcasting System carried a series of

interviews with the then present members of C Company (Calley's old company) and compared their actions with those allegedly involved in the "atrocity" in March of 1968. The interviewer refers to the incident as "the mass slaughter of innocent civilians". The gist of the interviews was that the present members of the company were ashamed of the history of the company and were simply doing their job as soldiers, following orders, and emphasis was placed on the statement that those orders did not include the "mass slaughter of innocent civilians".

In its issue of November 28, 1969 Time Magazine devoted considerable space to recounting all of the "testimony" from the various "witnesses" who had been interviewed, the caption of its article being "The My Lai Massacre", and Calley's picture was displayed immediately under the heading, and in its issue of that week Newsweek Magazine did much the same thing.

In the issue of Life Magazine for December 1, 1969 there was published the "full" story of the My Lai incident complete with all of the alleged eye witness accounts and the full-page color photographs purchased from Haeberle, and at the conclusion the magazine made a judgment with regard to the matter. Instead of abating after the order of November 25, *the coverage intensified.*

While the many articles and broadcasts dealing with the My Lai incident sometimes made mention of the fact that an entire company of men was involved in whatever happened, the focus was nevertheless always on Calley and he was inevitably singled out as the one to be saddled with responsibility. On December 16, 1969 Walter Cronkite, on the CBS evening news broadcast, said:

> "The principal figure in the My Lai massacre is Lt. Calley, charged with the murder of more than one hundred South Vietnamese civilians."

And segments of the press not only recognized that Calley was being isolated and prosecuted by the press to the extent that it might be impossible for Calley to have a fair trial, but they actually indulged in self-praise of their prosecution of the man. Typical of this attitude is an editorial in the Washington Post of December 4, 1969, in which the writer admits that the massive publicity might make it impossible for Calley to obtain a fair trial, but then quotes in obvious self-glorification from an editorial which had appeared in an Italian newspaper dealing with the Calley case and the coverage being given it by the American press, which read as follows:

> "The civilization of a people is judged above all by the courage and the severity with which it isolates certain individuals and denounces their crimes. The American press has done and is doing its duty."

Certainly the American press *had isolated* Calley, certainly it was dealing with him *with severity*, certainly it was *denouncing him* in practically every issue, and certainly it was making it impossible for Calley to obtain a fair trial. We have never conceived this to be the duty of the press, but if it is the duty of the American press, it then becomes the duty of the judicial system to see to it that any conviction so obtained is set aside.

A prime example of the manner in which Calley was *isolated and dealt with severely* is the December 5, 1969 issue of Time Magazine. In this issue Time devoted its front cover to a full-page color picture of Calley with the question

"THE MASSACRE

Where Does the Guilt Lie?"

transposed across the upper left portion of the page and the identification

"Lieut. William Calley, Jr."
appearing at the bottom of the page beneath his picture. In other words, Time asks the question—who is guilty? And then answers its own question on the

670

same page for the benefit of its millions of readers (including all prospective jurors).

Only an imbecile could fail to get the message.

Because this is a good example of the point being made, a somewhat inadequate reproduction of this magazine cover is here set forth, the reproduction not being in color.

FIFTY CENTS DECEMBER 5, 1969

Inside the cover of this issue of Time there is page after page of summarization of interviews with "witnesses", quotations from prominent persons condemning the action, reproduction of gory and inflammatory pictures, and a long biographical sketch of Calley. While purporting to be a factual summarization, the article contained strong editorial comment. For instance, it is stated:

The central platoon (apparently about thirty men), commanded by Lieut. Calley, headed into the village. It met no resistance on the outskirts. But despite the lack of enemy fire, Calley's men in less than twenty minutes ignited "hootches" and chased all the villagers—whether fleeing, standing or begging for mercy—into groups, and shot everyone. All were either elderly men, women or children. Estimates of the dead ranged from a hundred nine to five hundred sixty-seven.

. . . . .

Did any soldier try to stop the slaying? One saw what was happening, then shot himself in the foot so he could get out of it—and he was the only U. S. casualty of the day's action. At one point a Private stopped firing his M-60 machinegun into a group of twenty people, refused to resume on Calley's orders—so Calley took the gun over and blasted away.

The magazine drew the conclusion that all the persons killed were "defenseless civilians" and sought to glorify some of the witnesses who were to later appear against Calley and to sustain the testimony of some witnesses who were later to deny that Captain Medina had given the order to carry out the operation.

What Time does here is ask the question—who is guilty? Then presents all of the "evidence" adverse to Calley and makes a judgment that Calley is the one, and, so that no one may misunderstand, says so in words and in pictures.

In the issue of Newsweek Magazine three days later, December 8, 1969, the same technique is used as was used in the issue of Time of December 5. Newsweek devoted its front cover to a full-page picture of Calley, identifying him by name, and interposed over the upper righthand corner the caption

"THE KILLINGS AT SONG MY".

Then there followed much of the same matter that appeared in the Time columns previously referred to.

On December 6, 1969 Life Magazine, resorting to what can only be described as surrealistic sensationalism, published a multi-page article which was headed

"THE MASSACRE AT MY LAI"

with sub-headings in large lettering at the top of the first page of the article reading "The Exclusive Pictures, Eyewitness Accounts", then there were reproduced in large detail the pictures allegedly taken by Haeberle, together with a recount of all of the statements of the alleged "eye witnesses". The article carried statements alleged to have been made by Calley at the time of the incident. Taking note of the fact that the South Vietnamese Government had issued a statement in defense of the American troops, the South Vietnamese Government regarding the incident as being "an act of war" instead of a war crime, Life stated:

"This is not true. The pictures shown here by Ronald Haeberle, an Army photographer, who covered the massacre, and the interviews on the following pages *confirms* a story of indisputable horror—the *deliberate slaughter* of old men, women, children and babies." (Emphasis added.)

The total effect of these pictures and the accompanying accounts given by those interviewed, and the editorial comment throughout the article, can be fully comprehended only by an actual examination of this issue of this magazine. It is all in the record. There can be no question, however, that Life Magazine *had concluded and intended for its readers (including all prospective jurors) to conclude* that innocent civilians had died at My Lai and that Calley was in large

part responsible for it. The article was capped off with interviews of alleged survivors of the alleged "massacre". The devastating effect of this article and those similar to it on Calley's defense cannot be denied. No person, however honest minded he might try to be, could avoid the lasting emotional impact of this article and the accompanying photographs.[9]

During the weeks following the date when charges were brought against him Calley, either by personal choice or on the advice of counsel, had declined to be interviewed by the press or to make any statements to the press, which was his constitutional privilege, and so long as he remained on the military reservation at Fort Benning he was protected from press intrusion.

On December 5, 1969 he was required to appear before the Army Investigating Committee looking into the My Lai incident, and this appearance had to be made at the Pentagon in Washington. So, this meant that the press and television representatives were going to have their chance to "get at him". As he entered the Pentagon on that date photographers, reporters and curiosity seekers in large numbers were lying in wait for him, much as might be expected of a pack of wolves stalking an injured animal. As he entered the building questions were shouted at him, such as,

"Hey, Calley, did you really kill all those people?"

"How does it feel to shoot babies?"

"Why won't you talk?"

And some of the crowd jeered him in much the same fashion as history tells us was done by the spectators at the Roman Circus when slaves and captives were tossed to the lions for their entertainment.[10] When Calley maintained his silence the commentators on television and in the press made mention of that fact, commenting that he was "one of the few men in any way in-volved in the case who has not publicly talked about it". They drew the contrast between him and those who were talking freely and all insinuated that he had "something to hide". On the CBS evening news of that date Calley was shown entering the Pentagon and the news commentator stated that Calley was obviously "showing the pressure" and that Calley's attorney had advised him not to make any statement, but instead to claim his right under the Fifth Amendment and remain silent because his statements "might be used against him". On that same date ABC's Pentagon correspondent, Bill Downs, had this to say:

> "The army indictment charges that Lieutenant Calley with his own rifle did commit the premeditated murder of one hundred ten men, women and children at the village of My Lai Four. Some twenty months later, twelve thousand miles away, here at the Pentagon, the charges seem more fantastic as the twenty-six year old Lieutenant marched tight-lipped into the Army's operation center where the Military Board is holding its hearing. Calley was not wearing the two bronze star decorations nor the purple heart ribbon that the Army gave him for meritorious service in Viet Nam. He wore only his honored Infantryman's badge, combat Infantry badge, the Army's insignia of its fighting men. Neither he nor the military panel would comment on today's two and a half hours testimony."

On the ABC broadcast above mentioned on this date Frank Reynolds made this comment:

> "Lt. William Calley, against whom formal charges have been made in connection with the alleged massacre at My Lai, testified in secret today before a special Army Board investigating the original investigation. Lt. Calley is not only the one man charged

9. As will be later discussed, some of the jurors who sat in this case read Life's "presentation" and remembered it months later.

10. See generally, Durant, *The Story of Civilization*, Vol. III, Chapter XVII.

with wrongdoing, he is also one of the few men in any way involved in the case who has not publicly talked about it and that is still true tonight."

On the NBC TV news on that same date the newscaster commented on the fact that "Calley still refused to talk" about the charges brought against him, and the commentator pointedly drew the distinction between Calley's silence and the fact that others had talked freely with newsmen, and the commentator went on to say that Calley's lawyer had advised him not to talk because his statements might be "incriminating".

Thus was Calley ridiculed before the public for exercising his constitutional right to remain silent and the insinuation definitely planted in the public mind (and in the minds of all prospective jurors) that *he must have something to hide.*

Of course, this same treatment was given the matter by the press and the weekly news publications. Some of the headlines are indicative:

LT. CALLEY STILL MUM

CALLEY IS QUIZZED BY PENTA-GON PANEL—WON'T COMMENT

CALLEY WON'T TALK

On December 15, 1969 Newsweek Magazine drew a stark comparison between what it called the "stony silence" of Calley and the fact that Captain Medina "tells his story", and then Parade Magazine distributed January 18, 1970 had as its feature an article written in praise of Ron Ridenhour, who is the former member of the Army who is credited with exposing this "most unconscionable atrocity", and in this article Ridenhour is quoted as saying that the reason he exposed it is that it is a matter of conscience with him, and he comments on the fact that others who he says were involved (including Calley) have kept quiet. He has this to say:

"Each of us reacts differently. I don't fault the guys from C Company who were involved in the massacre for keeping quiet. They had their reasons —fear, guilt, whatever they were." And then the article states that "he (Ridenhour) *knows a good deal about* Lt. William Calley charged by the Army with premeditated murder of 109 men, women and children". The clear message is that Calley is keeping quiet because of fear or guilt. (Emphasis added in above quotation.)

Although the military judge had on November 25, 1969 ordered all prospective witnesses in the Calley case not to make any public statements concerning the matter, and although it was well known that one of the contentions which would be made by Calley in his defense would be that the company was carrying out orders given to it by the company commander, the military judge on December 3, 1969 made an exception to this rule and permitted Captain Medina to hold a news conference in the Pentagon the next day. On December 4 Captain Medina, accompanied by his lawyer, put on an impressive performance for all the news media and repeated his statements in subsequent television appearances and newspaper interviews that took up the next four or five days, in all of which he denied issuing orders to kill civilians. No immediate attempt was made by the military judge to bar Medina from speaking out even after he repeatedly denied issuing orders to destroy the village, although as heretofore noted, this was a question which bore heavily on the defense of Lt. Calley. Calley's lawyers were greatly disturbed by the development and the military judge explained that he had excepted Medina from his order "because I didn't think he would grant an interview". He then —after Calley's defense had been effectively torpedoed—ordered Medina to stop talking.

This development is highly important in our consideration of this case because it later appeared that one of the jurors who sat in judgment on Calley witnessed these interviews of Medina and said that he *was impressed and thought that Medina was a credible witness.* Since Medi-

na later appeared as a witness in the Calley trial, what this means is that one of the jurors had already concluded that Medina was credible and that in consequence Calley could not be credible on this vital point.

Although Medina was finally barred from talking, his attorney, F. Lee Bailey, continued to take Medina's case to the public and point the finger at Calley. Within a period of two days in mid-January, 1970 Bailey ,appeared on two Washington television shows and on one of these broadcasts he said that he didn't think that anyone "of any higher rank than Lt. Calley is going to be put on trial because right above him is Captain Medina. . . . it wouldn't make it more fair to charge Medina if he had nothing to do with it. If Calley shot some people he shouldn't have shot . . . Medina didn't know about it, didn't tell him to and had no opportunity to stop him."

So, here was the lawyer for Medina instructing the public (and all prospective jurors) that Calley's defense was a sham. Of course, the newspapers gave "ample" pre-trial coverage to Medina's damaging "testimony", as is indicated by the following headlines which are typical:

MEDINA DIDN'T RECEIVE, GIVE "BUTCHER" ORDER

MEDINA DEFENDS HIS ROLE

NO "KILL" ORDER, BAILEY DE-CLARES

LAWYER SAYS CAPTAIN MEDI-NA GAVE NO MASSACRE OR-DER

MEDINA HALTED SHOOTING, SOURCE SAYS

MEDINA CITED FOR GALLANTRY

As if enough damage had not already been done to Calley's chances to obtain a fair trial, the President of the United States, who was also the Commander in Chief of the Armed Forces and therefore the Commander in Chief of each of the military board members who would decide Calley's case, on December 9, 1969 held a nationally televised news conference in which he discussed the My Lai incident, during the course of which he made the following startling statement:

"What appears was certainly a massacre, and under no circumstances was it justified."

. . . . . .

"Now this record of generosity, of decency, must not be allowed to be smeared and slurred because of this kind of an incident. That's why I'm going to do everything I possibly can to see that all the facts in this incident are brought to light, and that those who are charged, if they are found guilty, are punished, because if it is isolated it is against our policy and we shall see to it that what these men did—if they did it—does not smear the decent men that have gone to Vietnam in a very, in my opinion, important cause."

Then to further compound the damage General William C. Westmoreland, the Chief of Staff of the Army and therefore the highest ranking Army officer to whom all of the later court members were subordinate, held a press conference in Charlotte, North Carolina, during the course of which he said:

"I would say there is no justification for it whatsoever, and it is contrary to the rules of land warfare which has always governed the conduct of our troops on the battlefield. And strictly contrary to regulations and contrary to the instructions that were issued to the troops in Viet Nam."

. . . . .

". . . [t]he individuals who have committed offenses, after appropriate investigation has been made of course, will be charged and if the charges are supported by further investigation known as a Form 32 investigation, . . . they will be court-martialled. . . . In other words, the law of the land which pertains in this case, now the Uniform Code of Military

Justice, will be followed and the individuals will be given justice."

Three days earlier General Westmoreland appeared at Fort Campbell, Kentucky and was reported by the press as having declared "that an unlawful order from a superior does not excuse or justify one of our soldiers in killing an innocent civilian".

Thus did the President and the highest ranking Army officer instruct all prospective jurors in advance of trial (1) that Calley had no defense, and (2) that the Army's good name was at stake.

It has heretofore been noted that when these statements by the President and General Westmoreland were brought to the attention of the military judge, along with those made by the Secretary of State, Secretary of Defense, and the Secretary of the Army, the military judge candidly admitted "I can't stop that".

Of course, the views of the President and the General were widely publicized in newspapers and weekly news magazines. Here are some of the headlines:

MASSACRE "ABHORRENT"

VIET NAM MASSACRE HIT— PROSECUTION PLEDGED BY NIXON

NIXON CONDEMNS MASSACRE AND PLEDGES PROSECUTION

NIXON EMPHATICALLY CONDEMNS VIET NAM MASSACRE OF CIVILIANS

WESTMORELAND: "NO JUSTIFICATION"

SOLDIERS CAN REJECT WRONG ORDER: WESTY

On December 10, 1969 the television networks interviewed another prospective prosecution witness by the name of Herbert Carter, who recounted the details of what he saw concerning which he would later testify.

On December 11, 1969 a helicopter pilot, Chief Warrant Officer Hugh Thompson, appeared before what was supposed to have been an executive session of the House Armed Services Subcommittee. Later that day the ABC TV newscast carried a report of what Thompson allegedly said before this executive session, and in what amounted to triple hearsay the news reporter quoted what Thompson *was said to have said* before the committee, and here is what he said that Thompson is said to have said:

The helicopter pilot, Chief Warrant Officer Thompson, told the Committee that he argued with Lt. Calley over the fate of wounded Vietnamese civilians he was trying to rescue. He said he saw between twenty-six and fifty dead men, women and children. A Committee source, who insists on remaining unidentified, said Thompson indicated that his helicopter guns were trained on the men of Calley's platoon during the argument.

Pressed by at least four Committee members to explain why, Thompson replied again and again, I don't like to get shot at by anybody, sir.

Thompson says that when he told Calley he intended to rescue the wounded, Calley said the only way you are going to get them out of there is with a grenade. The pilot declined to offer an explanation of that remark. He said that he loaded sixty-nine of the wounded on his chopper and flew off. One of the victims, a child, died en route to the hospital.

Thompson later appeared as a prosecution witness against Calley. Typical newspaper headline:

COPTER PILOT TELLS HOUSE INQUIRY OF RESCUING VIETNAMESE AT MY LAI.[11]

By mid-December a number of newspaper articles, some containing inter-

---

11. The newspaper accounts referred to Thompson as "the Pinkville hero" even though his testimony before the House Arm- ed Services Committee led the investigators there to seriously question his veracity.

views with psychologists and other "experts on human behavior", suggested that Calley and any others who might be charged in connection with the My Lai incident, should not be thought of as the "clean cut type of boy ordinarily found in the Army", and "testimony" of witnesses was published to the effect that the troops at My Lai were either insane or under the influence of drugs. These headlines are suggestive of the content of the stories:

SOLDIERS IN MY LAI COMPANY USED MARIJUANA

CAPITOL HILL TOLD GI's AT MY LAI WERE POT SMOKERS

MARIJUANA USE TOLD AT MY LAI

GI's EXPERIENCE WILD EMOTIONS

MY LAI SEX ACTS CHARGED

COMBAT INSANITY

PLEA OF INSANITY FAVORED FOR GI's

WILD ANIMALS—HOW GI's HAD DISINTEGRATED

From late November, 1969 until Calley's trial began and continuing while the trial was in progress various persons prominent in the Government (including the President and the Secretary of Defense) and high ranking officers in the Army granted interviews and made statements to the effect that My Lai was to be regarded as an "insoalted incident", "not typical" and "to be condemned"; that the Army's image had been "besmirched", and that the "guilty" should be convicted, thereby "clearing the air" and restoring the Army's good name. The clear implication was that unless "somebody" was convicted by court-martial the Army would suffer, and there wasn't much doubt about who that "somebody" was. Since only career Army officers would sit on the jury, this made things pretty clear. These were some of the headlines:

U. S. MILITARY WOUNDED DEEPLY

SAVING THE HONOR OF THE U. S. ARMY

SOLDIERS FEEL SHOCK

ARMY "SHOCKED AND SICK" OVER MY LAI

ARMY RULES CALL FOR HUMANENESS

VOLUNTEER ARMY SET BACK BY MY LAI

MY LAI REACTION MAY EMBARRASS GI's

ANGUISH AT WEST POINT

CAPTAIN WANTED CALLEY CHARGED—RETURNED FROM WAR TO TESTIFY

OFFICERS HAD PLANNED TO ACCUSE LT. CALLEY

ARMY STANDING IN DANGER

ARMY ACTS WISELY IN PROSECUTION

ARMY CHIEFS WENT ALL OUT TO PREVENT BRUTALITY BY GI's

DEFAMING THE MILITARY

OUT, DAMNED SPOT!

LET'S CLEAR THE AIR

In its issue of December 22, 1969 Newsweek Magazine devotes considerable space to a lengthy summary of "all the evidence" that had been developed by interviewing the witnesses in advance of the court-martial and pointing up the fact that Calley had remained silent. The article makes mention of the fact that Calley's attorneys were contending that the mass publicity about the matter would make it impossible for Calley to obtain a fair trial. But Newsweek berates this contention by advising its readers that this is simply a "legal maneuver" and says that the Nixon administration is committed to pursuing the matter.

In early January, 1970 the Sunday Times Magazine carried a lengthy article dealing with Calley and My Lai in which all the lurid pictures which had previously appeared in Life and elsewhere are reproduced, and in which there was a complete recapitulation of all of the statements which had been made by the various people who "would be witnesses", some of whom professed to quote Calley. This introductory statement to the article is made:

"The evidence . . . mounts each day that in some concatenation of horror reason was lost and wholesale massacre of these men, women and children took place. On these pages we publish the evidence of Sgt. Haeberle's cameras. He himself has no doubt how these bodies came to be lying there. His testimony, and that of his comrades, follows on page 20."

The Court does not deem it necessary to make specific reference by date to other instances of damaging pre-trial publicity. It will suffice to say that, contrary to the wishful observation made by the military judge in early December, 1969 that the publicity had subsided, a review of the mass of appellate exhibits on file clearly shows that the amount of television and press coverage, replete with alleged statements of witnesses and accompanying photographs and detailed descriptions of the participants, did not diminish as time passed, but in fact increased over a period of weeks and months on into the year 1970 and up until the time of trial.

Arbitrarily taking the period of one month from November 17, 1969 until January 20, 1970 the exhibits on file show that there were 43 instances of national network TV news broadcasts about My Lai and Calley, and for some reason there is a gap in the exhibits introduced between December 8 and December 26. If the television tapes for that period were also available the number would doubtless be increased substantially. The exhibits which are actually on file show that there were network broadcasts as follows:

Monday, November 17, ABC
Monday, November 17, CBS
Tuesday, November 18, ABC
Tuesday, November 18, CBS
Tuesday, November 18, NBC
Wednesday, November 19, CBS
Friday, November 21, CBS
Friday, November 21, NBC
Monday, November 24, ABC
Monday, November 24, CBS
Monday, November 24, NBC
Tuesday, November 25, NBC
Wednesday, November 26, ABC
Wednesday, November 26, ABC
Wednesday, November 26, NBC
Thursday, November 27, CBS
Friday, November 28, ABC
Friday, November 28, ABC
Friday, November 28, CBS
Monday, December 1, ABC
Monday, December 1, CBS
Tuesday, December 2, NBC
Wednesday, December 3, ABC
Thursday, December 4, ABC
Thursday, December 4, NBC
Monday, December 8, NBC
Monday, December 8, ABC
Monday, December 8, CBS
Friday, December 26, ABC
Wednesday, December 31, ABC
Wednesday, December 31, NBC
Friday, January 9, ABC
Friday, January 9, NBC
Tuesday, January 13, NBC
Wednesday, January 14, ABC
Thursday, January 15, NBC
Friday, January 16, CBS
Friday, January 16, NBC
Monday, January 19, ABC
Monday, January 19, CBS
Tuesday, January 20, ABC
Tuesday, January 20, CBS

As might be expected, the publicity and editorial comment was not limited to television, newspapers and weekly news magazines, but was also being carried in such publications as Harper's Magazine, The Saturday Review, The New Republic, Editor and Publisher, The National Observer, The Nation, Esquire, Playboy

Magazine, and significantly, numerous clippings on file in this case show that the alleged massacre and the charges that were brought against Calley were dealt with on numerous occasions in Armed Forces publications such as Army Times, Stars and Stripes, Armed Forces Journal, Air Force Digest and Navy Times.

To illustrate the degree and variety of publicity concerning the Calley case to which all segments of the public were exposed it is noted that in late December, 1969 a phonograph album entitled "Massacre at My Lai" with sub-titles "The War Crimes" and "The Killers" was commercially exploited and Calley was mentioned by name on the album jacket. The album was advertised with posters showing some of Haeberle's photographs in vivid color and the narrative on the records is presented with the accompaniment of background music (flute and bass).

In January, 1970 two full length books were published which assessed Calley as an individual, set out all of the evidence which was to be presented at his forthcoming trial (or which the authors thought would be presented) and left the reader in no doubt as to what the verdict should be. Insofar as the Court is aware, this is the first time in the history of American jurisprudence where a defendant has been subjected to such public treatment in advance of trial.

The first of these books, written by Seymour M. Hersh, was published by Random House and the title is *"My Lai 4—A Report on the Massacre and Its Aftermath"*. The contents are described on the jacket of the book as follows:

"On March 16, 1968 a company of American fighting men entered My Lai 4, a small hamlet in South Viet Nam, and systematically murdered its inhabitants. Eighteen months later the Army charged a young lieutenant with the murder of 102 of those civilians.

"The story of that atrocity—and the subsequent charging of Lt. William L. Calley, Jr.—was first told to the world by Seymour M. Hersh in a series of newspaper stories published in November, 1969.

"Traveling more than 50,000 miles around the United States Hersh managed to find and interview nearly 50 members of Charlie Company. Now, from these eye witness accounts he has reconstructed not only what happened on that tragic day but, most importantly, why it happened."

It is 210 pages in length and was sold at book stores throughout the United States.

The book can only be described as devastating to Calley and to his case.

The author begins with a general denigration of Calley as an individual, telling us that Calley "is only five feet three inches tall" [12] and came from "an emotionally cold family", and that he made poor grades in school, was never relaxed, and smoked cigarettes excessively at an early age. The author is careful to let us know that Calley has a criminal record because when he worked for a time as a railroad switchman he once was served with a summons for allowing a freight train to block a street crossing too long. He tells us that Calley was a "wanderer" and that for about three years everybody thought he was dead until he showed up in the Army; that he graduated from Officer Candidate School at Fort Benning without even learning how to read a map. The author then professes to quote former members of Calley's platoon (some named and some unnamed) as follows:

"Everybody used to joke about Calley. He was one of those guys they just took off the street."

"He didn't know what was going on half the time."

"He was always trying to be the big man; always would be the one to beat them [Vietnamese] up."

12. Belittled because of being little.

"He reminded me of a kid, a kid trying to play war."

"Captain Medina didn't show any respect for Calley. It was kind of hard for anybody else to show respect."

"Medina would refer to Calley as 'sweetheart'."

"Medina didn't like Calley. Calley was always doing things wrong . . never right."

"I wondered sometimes how he got through OCS; he couldn't read no damn map and a compass would confuse his ass."

"He was always trying to do things that would make him out to be a hero."

"That's what he tried to do—be a good boy in front of the Captain."

"He was always trying to be the first one."

"We mocked him."

The death of a radio man in the company is described as "simply another result of the Lieutenant's stupidity".

"He [Calley] was jeopardizing his people, their lives and what not, just for his reputation."

Some "witnesses" then describe how they say Calley killed Vietnamese civilians *before* the My Lai incident, always "without justification".

Next, all of the testimony which was to be given later at the court-martial with regard to Calley and My Lai (and much that was not) is presented by the author in detail, the persons giving the information always being made to appear in the most favorable light and the accusing finger always being pointed at Calley, some even suggesting that Calley's forthcoming trial was Divine retribution, a favorite phrase being

"Maybe God done caught up with Calley."

. Throughout the narrative the author describes what occurred as "murder" or "massacre" or "atrocity".

Then the author recites matter damaging to Calley's defense which was sup-

posed to have been developed by the House Armed Services Committee "behind closed doors" (the author not explaining how he came upon it), and which was supposed to be forthcoming in the "secret Peers Report". Finally, in the last chapter we are given this picture of Calley as he awaits trial (page 186):

"Calley's attitude didn't change even after the Army stripped him of his Viet Nam decorations including two Bronze Stars and shifted him from a training job to a meaningless clerical task at base headquarters. . . . 'He wants to hang,' an officer friend said. The Lieutenant was showing increasing signs of tension. He lost weight, and another friend was shocked when, while drinking beer, Calley suddenly dashed into a bathroom and vomited blood. He explained that he hadn't been able to keep food in his stomach for days and had been drinking beer instead."

In brief, what we have here is a pretrial prosecution piece which held Calley up to the world as a midget monster murderer who went about on his own slaughtering innocent civilians, willy-nilly, for the pleasure of the experience, and in so doing has dishonored the nation and is now suffering from such a guilt complex that he wants the court-martial to hang him.

Lest it be thought that this damaging material had only limited distribution by being available only for a price at a book store, it should be noted that the entire book was published in serialized form by a large number of newspapers throughout the country and was available for all (including prospective jurors) to read.

The book was given wide publicity and the author of the book, Mr. Hersh, was interviewed on the CBS program "Sixty Minutes" on May 27, 1970, and when asked if he did not think that his book damaged Calley's rights to a fair trial he responded by saying that it was not his intention to deliberately invade

the rights of those accused in the My Lai incident to a fair trial, but he added, "I think the value of the story goes far beyond any possible violation of rights."

The other book was written by Richard Hammer and is entitled *"One Morning in the War—The Tragedy at Son My"*. This book was published by Coward-McCan, Inc. in early 1970 and contains 207 pages. It also rehashes all the evidence and makes evaluations and was sold at book stores throughout the country. It was published not only in hard back form, but in paper back form also.

In the issue of Time Magazine for May 25, 1970 there is a review of the two books above referred to by Hersh and Hammer and the review concludes with this paragraph:

"In pinpointing the involvement of Charlie Company's officers, including Captain Ernest Medina and Lt. William Calley, Jr., he [Hersh] names the accusing witnesses and scrupulously uses no anonymous quotation. His book *bluntly lays out much of the prosecution's case* in the impending military trials. He even had access to some reports of the Army's Criminal Investigating Division." (Emphasis added.)

And then the author of the review adds this footnote:

"Because of the widespread discussion of the case in the press, Lt. Calley's lawyer has contended that a fair trial is impossible. These books are sure to bolster his argument."

The Court is of the opinion that it can be safely said that anyone who devotes the necessary hours and days to an examination of the mass of exhibits in this case (as this Court has done) will come away with the definite impression that a large part of the publicity about My Lai and especially the "Calley case", and the editorials and comments of columnists relative thereto, was generated by two groups having opposing views about this country's involvement in the Vietnam war and the Army's role therein, and each group wanted to see Calley convicted not so much because he was Calley, but because the fact of his conviction would arguably sustain their respective positions. The first group was made up of those, including many segments of the news media, who saw the Calley case as being a vehicle which if dramatized in the public eye would soil the Army's image and cause the American people to question the country's further involvement in the war and lead to an early withdrawal. The second group, also composed of segments of the news media, was determined to show by Calley's conviction that the incident was not the result of the Government's policy in Vietnam, nor was it typical of the Army's conduct of the war, but was instead an isolated incident brought about by the acts of one man or a small group of men who had besmirched the Army's image and whose conviction was necessary to remove the blot.

Unfortunately for Calley, who was caught in the crossfire of these opposing forces, his defense was effectively destroyed prior to trial regardless of which side won or if perchance it was a stalemate.

Eventually even some of those who had been responsible for generating and/or publishing the prejudicial pretrial matter came around to recognizing that because of the publicity there was serious question whether Calley could obtain a fair trial. On November 26, 1969 Secretary of the Army Resor said:

" . . . there has already been far too much comment in the press on matters of an evidentiary nature, and we are very concerned that prejudicial pre-trial publicity may make it difficult to accord the accused . . . a fair trial."

And in the issue of the Baltimore Sun of December 8, 1969 Secretary Resor is again quoted as saying:

"There is a serious problem as to whether Lt. William L. Calley, Jr., charged with the murder of 109 civil-

ians, can get a fair trial in view of the publicity surrounding the episode."

He is further quoted as saying that he hoped the news media would "exercise self-restraint from this point forward so as not to further jeopardize the chance of a just trial".

The New York Post of December 6, 1969 carried an editorial under the heading "MASSACRE AND THE MEDIA" in which the following statement was made:

"The question whether Lt. William Calley can obtain a 'fair trial' in the light of what has been printed and televised about the My Lai massacre is a troublesome one."

In its edition of December 4, 1969 the Washington Post said editorially:

"There is a patent conflict between the right of the American public to know the whole truth about Mylai and the right of Lt. William L. Calley Jr. to a fair trial on charges arising out of his alleged participation in that tragic episode. The tornado of accounts—some by persons asserting that they were eyewitnesses, some based on no more than hearsay, some of them self-serving or tendentious or condemnatory and none of them tested by cross-examination manifestly present a threat to the detachment and objectivity of the court-martial that will try the lieutenant."

Then the editorial concluded:

"Should it become necessary to choose between prosecuting the lieutenant and informing the public about Mylai, the latter would surely deserve precedence."

Time Magazine, a publication which had certainly done its part in the pretrial prosecution of Calley, was still continuing its coverage on July 27, 1970 when it was again reviewing the matter, and in the body of the article published on that date the writer recognized that a serious question had arisen as to whether Calley could receive a fair trial as a result of the "eye witness accounts, gris-

ly colored photographs of the carnage and statements deploring the alleged massacre by President Nixon, Secretary of Defense Laird, and others".

On December 13, 1969 the American Civil Liberties Union urged the Army to drop its plans to prosecute Calley, observing that "it would require super human characteristics" for a juror to ignore publicity about the case, stating further:

"It will no doubt be said that the enormity of the crime charged demands that those who are alleged to have committed them be brought to trial and convicted if guilty.

But the judgment which the nation's press has expressed by its deeds, is that these crimes demand public examination even more. In the face of the latter judgment the nation cannot in fairness exact retribution from those who have paid the price of this public examination by suffering the loss of and right to a fair trial."

The statement concluded with these words:

"It is in our opinion impossible for him [Calley] to receive a fair trial."

By mid-1970 the question whether Calley could obtain a fair trial was a subject widely discussed in legal circles and the concern of the profession was, in this Court's opinion, wholly justified because by the time Calley's trial began he had already been crucified.

In almost every article where the words "massacre", "atrocity" and "mass murder" appeared the name "Calley" appeared.

During almost every interview of "witnesses" either the "witness" or the interviewers mentioned the name of Calley.

In almost every commentary on the need of the Army to "cleanse its name" mention was made that Calley had been charged.

In almost every editorial demanding that the "guilty" be convicted mention was made that Calley would be tried.

Yes, by the fall of 1970 Calley had been crucified on a cross of newsprint and television tape. And the fact that the cross carried a label "free press" made the experience no less painful to the victim.

Calley was finally brought to trial in November, 1970.

Cautionary instructions were given to the military jurors after they were impanelled and they were intermittently cautioned throughout the court-martial proceedings to avoid exposure to publicity. Unfortunately, these cautionary instructions came too late to have any effect. By the time they were impanelled all of the jurors had been exposed to the proliferation of massive publicity which condemned the Petitioner, and, as already noted, five of the six jurors who ultimately were impanelled and sat in judgment of the Petitioner were exposed to more than one year of massive and virulent publicity. They received no cautionary instructions prior to their being detailed to sit by the convening authority. Again, the resulting prejudice in this instance was caused by a defect in the military justice system itself, since court members, who are the civilian equivalent of jurors, are not appointed until they are detailed by the convening authority. In this case five of the six jurors were not appointed until one year after the Petitioner's case was referred to trial. Thus, practically speaking, there was no way that the military judge could have protected the Petitioner from the damage caused by exposure of the potential jurors to publicity since the identity of potential jurors was not known at the time of the exposure.

■ Petitioner does not claim that the press was not entitled to report the news concerning the litigation in which he was involved, rather he asserts, and rightfully so, that he is entitled to relief if the court in which he is being tried and the government which tried him are unable to prevent the adverse effect of the free dissemination of the material.[13] No system of justice can rightfully call itself just if it operates in an atmosphere where the courts are unable to protect the accused who appears before them. Such a requirement is surely fundamental to due process of law. If the system under which an accused is tried leaves him at the mercy of the press and other media, whether responsible or irresponsible, without insulating his right to a fair trial from the invasion of the news media, so great a deprivation of individual dignity and liberty would result that justice would never avail for the individual who found himself in such a position. As Mr. Justice White stated in Miami Herald Publishing Company v. Tornillo, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), ". . . the press is not always accurate, or even responsible, and may not present full and fair debate on important public issues" (concurring opinion, 418 U.S. at 260, 94 S.Ct. at 2841, 41 L.Ed.2d at 742). In Pennekamp v. Florida, 328 U.S. 331, at 365, 66 S.Ct. 1029, at 1046, 90 L.Ed. 1295 (1946), Mr. Justice Frankfurter recognized in his concurring opinion that "Without . . . a lively sense of responsibility a free press may readily become a powerful instrument of injustice".[14] This is not only true when there is a debate of important public issues involved, but even more so in a highly publicized criminal trial of an individual. The issue is not whether an accused has a right to prevent the press and other media from disseminating news material; rather, it is whether the individual has a right to demand that

---

13. As the communications industry proliferates, the courts may some day be required to face the issue of whether a trial judge has the power to impose a temporary "gag rule" on the press. It is not necessary that we reach that issue here for the military

judge recognized that he had no such power. He stated, however, that had he had such a power he would have imposed a gag on the media because of the obvious damage.

14. "The greater the power, the more dangerous the abuse." Edmund Burke.

the system in which he is being tried *protect his right to a fair trial* from the adverse effect of such dissemination. The choice of the material that goes into a newspaper or that is reported on television or radio, and the decision made as to limitations on the content, and the treatment of public issues and public figures—whether fair or unfair—is a matter of editorial control and judgment. This is what is known as a "free press". While government has no authority to restrain the reporting of the press nor to dictate what it does or does not report (Miami Herald Publishing Company v. Tornillo, *supra*) a person accused of crime has the right to expect his government and its judicial officers to protect him from massive and prejudicial publicity *surrounding his case*. The issue is not one of "free press". Rather, it is a question whether the individual is entitled to be tried in an atmosphere free of prejudicial publicity and the pall of injustice that it casts over the proceedings. It is the Court's view that our Constitution guarantees that the individual must be so protected. The Petitioner was not.

The published and televised statements of Ridenhour, Meadlo, Terry, Thompson, Medina, Westmoreland, the President and others were of such nature to clearly convict the Petitioner. Meadlo said that Calley not only ordered him to shoot "innocent civilians" but shot them himself. Medina denied giving Calley any order to act as he did. The statements of the President and Westmoreland ruled out any justification or excuse for his actions. The total effect was to convict the Petitioner just as surely as if he had confessed on the television screen.

■ Yet the due process clause of the Constitution guarantees to every accused, whether civilian or military, that the evidence against him shall come in open court, from the witness stand, admitted according to law, with the full judicial protection of the accused's right to confrontation and cross-examination.

Turner v. Louisiana, 379 U.S. 466, 85 S. Ct. 546, 13 L.Ed.2d 424 (1965).

In our system of justice it has long been held that "it is the right of a defendant accused of crime to have nothing reach the mind of the jury concerning the case except strictly legal evidence admitted according to law, and if facts prejudicial to him reach the jury otherwise" reversal is required. Griffin v. United States, 295 F. 437, 439 (3 Cir. 1924).

As Mr. Justice Holmes said in Patterson v. Colorado, 205 U.S. 454, 462, 27 S. Ct. 556, 558, 51 L.Ed. 879 (1907):

> "The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print."

And it is of special importance that this principle be observed in a capital case, such as that under consideration. Mattox v. United States, 146 U.S. 140, 149, 13 S.Ct. 50, 36 L.Ed. 917 (1892).

Relying upon this well-recognized doctrine, the Petitioner's counsel at the beginning of his trial placed before the military judge a two-part motion requesting dismissal of the charges because of prejudicial pre-trial publicity. The first portion of the motion contended that the prejudice from publicity precluded Calley from *ever* receiving a fair trial. This motion was denied before *voir dire*. The second portion contended that the publicity had so tainted the prospective jurors that he could not receive a fair trial. The judge withheld his ruling on this motion until after *voir dire* with the express purpose of determining the effect of the publicity on the jurors. During *voir dire* only two of the six members eventually impanelled on the court were expressly challenged for cause on the ground of pre-trial publicity and it might have been better procedure for defense counsel to have reiterated the "publicity" challenge after *voir dire* of each member, but in view of the judge's procedure in holding his decision

in abeyance, it can be fairly concluded that this defense motion was, in effect, a challenge to each member on the basis of pre-trial publicity. The second portion of the defense motion was denied upon completion of the *voir dire* procedures, the judge accepting as valid the protestations of the prospective jurors that their judgment would not be affected by the publicity.

While deference must be accorded the exercise of discretion by the military judge in ruling on this issue, it is necessary that we examine further into the circumstances and explore the applicable law.

A large number of prospective jurors were examined and all of them admitted exposure to the publicity in varying degrees. A number of them stated that because of what they had heard, seen and read they had formed an opinion and could not be impartial. Eventually the court consisted of Colonel Ford, Major McIntosh, Major Brown, Major Kinard, Captain Salem and Major Bierbaum.

The *voir dire* showed that each of these court members who ultimately sat in judgment on the Petitioner had in-depth prior knowledge of the alleged facts, circumstances and participants involved, some even being able to recall the names of witnesses whose accounts they had seen on television or read in publications.

Colonel Ford, the President of the court-martial, was the only member of the court who was under the military judge's order of November, 1969 to refrain from exposure to the case.[15] He stated that prior to receipt of the order he had read news articles concerning the case and he remembered the names of Meadlo, Ridenhour, Medina, Mitchell and Calley. He had seen Calley's picture in a magazine. He had read articles in which the hearsay statements of Ridenhour had appeared. He had seen pictures of the alleged killings at My Lai on the front page of a Cleveland newspaper.[16] After receiving the order he tried to avoid exposure to the case but did see some newspaper headlines and did see and hear some news broadcasts.

Major McIntosh stated that he had read *books*,[17] magazine and newspaper articles about the case. He particularly remembered articles in *Life* Magazine and he remembered seeing the pictures in that magazine.[18] He recalled the Meadlo appearance on television. He saw and heard a newscast in which a helicopter pilot made statements.[19] He saw and heard Medina on television when Medina denied giving the order and said that he was "impressed" by the "straightforward" answers of Medina on television and expressed the opinion that Medina would make a "credible" witness.[20] He remembered that the Secretary of Defense had made statements about My Lai. He further stated that he had engaged in "normal shop talk" about the case with his fellow officers.[21]

---

15. The court orders pertaining to exposure were not applicable to any of the other court members since they were not appointed until November, 1970. This fact is here reiterated and emphasized since presumably neither the Court of Military Review nor the Court of Military Appeals considered it important to their opinion, they not having discussed it.

16. These were the Haeberle pictures which were later used by the prosecution as an important part of its evidence.

17. These would have been the books authored by Hersh and Hammer, these being the only books which had been published.

18. Here again, these would be prosecution Exhibits.

19. This would have been Thompson.

20. Thus he had prior to trial made a determination as to credibility that ultimately proved to be prejudicial to Calley. The defense did not waive his sitting since neither the prosecution nor the defense anticipated that Medina would be called. The court members requested his testimony.

21. This equates with deliberation outside of court.

He stated that he felt no sympathy for Calley.[22]

Major Brown had seen the pictures in *Life* Magazine. He recalled reading about the incident and described his reaction as being one of "shock". In further response he used the word "massacre" several times.[23] He remembered that high government officials had expressed concern over the Army's image and he remembered that they used the term "massacre" in describing the incident. He was a classmate of Medina.

Major Kinard had read accounts of the case in books,[24] magazines and newspapers from "the beginning" and had continued to do so as late as a few days before the trial. He knew that Medina was Calley's company commander and remembered him being on television. He recalled that the President of the United States characterized the incident as a "massacre".

Captain Salem stated that he had read newspapers, heard radio reports and seen television broadcasts on My Lai and the Calley case from the time the news first came out up to the time he was being questioned, but he said he did not have a clear recollection of the facts and circumstances but he knew the approximate number of "dead people" and that Calley was supposed to have killed them. He candidly admitted that during the course of the trial something might recall to his memory what he had previously heard and read.[25]

Major Bierbaum had been exposed to radio and television broadcasts and had read newspaper articles about the case for a year prior to trial. He had discussed the case with his fellow infantry students at Fort Benning until he received an "unusual" order through command channels not to discuss it.

Each of the members gave the uniform response that they had not formed an opinion about the case and that they would not be influenced by anything they had heard, seen or read, etc.

We do not doubt the honesty of the members of the court who gave this response, but jurors are human and are not always conscious of the extent to which they are in fact biased or prejudiced, and their inward sentiments cannot always be ascertained. See Stone v. United States, 113 F.2d 70 (6 Cir. 1940). What this Court determines is that in the circumstances here presented it was not humanly possible for the jurors not to be improperly influenced by prior exposure.

> "No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before one's fellows is often its father."

Irvin v. Dowd, 366 U.S. 717, 728, 81 S.Ct. 1639, 1645, 6 L.Ed.2d 751.

Here it affirmatively appears that for more than a year the jurors had been exposed to an avalanche of publications and newscasts containing testimony, opinions and judgments which had stated, directly and indirectly, (1) That people had been shot at My Lai; (2) That the people were innocent civilians; (3) That, as a result of being shot, the civilians were dead; (4) That the Petitioner had participated in the shooting; (5) That the shooting was wilful, deliberate and with malice; (6) That the Petitioner had himself shot certain of the civilians; (7) That the Petitioner had ordered other civilians shot; (8) That the company commander did not give Petitioner an order to so act; (9) That there was no justification for Petition-

---

22. After reading Hersh's book it is understandable that he would have no sympathy for Calley.

23. Interestingly, this is the word the press and the President used. It is apparent that he had a preconception that there was indeed a "massacre". This is knowledge a juror is supposed to get from witnesses in the courtroom—not from the media.

24. Hersh and Hammer again.

25. This is precisely the danger of pre-trial publicity and the point made by some of the decisions which will be hereafter discussed.

er's act; (10) That there was no excuse for Petitioner's act; (11) That the incident had shamed the nation; (12) That the President of the United States and officials in the Defense Department had condemned the incident; (13) That the Army's image was being tarnished by the incident; (14) That the Army's image should be restored and any stain on the reputations of those who fought valiantly and honorably in Vietnam removed; and (15) That the persons responsible for this sad state of affairs were being prosecuted by court-martial.

> "How can fallible men and women reach a disinterested verdict based exclusively on what they heard in court when, before they entered the jury box, their minds were saturated by press and radio for months preceding by matter designed to establish the guilt of the accused. A conviction so secured obviously constitutes a denial of due process of law in its most rudimentary conception."

Irvin v. Dowd, supra, at pages 729, 730, 81 S.Ct. at page 1646.

Much of the matter printed and broadcast which was seen and heard by the jurors was the rankest form of hearsay and could not be admitted in evidence. The interviews of Ridenhour, Terry, Thompson and Weigner already quoted, as well as what the "correspondents" quoted the Vietnamese "survivors" as having said was all hearsay, some even double and triple hearsay. Since every form of media carried these stories and they were repeated again and again, even in book form, it would be sheer fantasy to believe that the jurors did not see, hear and read them or that they were not influenced by it. Indeed, as we have seen, most of the court members admitted that they had been so exposed, some even remembering the names of the persons interviewed. Let us recall Terry's statement that he "had a friend that told me about this one incident with this Lieutenant Calley. And he ordered one man—I believe his name was Torres to shoot these—he gave him a machine gun and he ordered him to

shoot these people and he shot about half of them and he wouldn't do it any more so Calley grabbed the machine gun and shot the rest of them". This hearsay statement describes in most damaging terms alleged activities of Calley which were not elicited at trial from any source.

> "We have here the exposure of jurors to information of a character . . . [that] . . . could not be directly offered as evidence. The prejudice to the defendant is almost certain to be as great when that evidence reaches the jury through news accounts as when it is a part of the prosecution's evidence. Cf. *Michelson v. United States*, 335 U.S. 469, 475 [69 S.Ct. 213, 218, 93 L.Ed. 168]. It may indeed be greater for it is then not tempered by protective procedures."

Marshall v. United States, 360 U.S. 310, 312 and 313, 79 S.Ct. 1171, 1173, 3 L.Ed.2d 1250 (1959).

Of course, no one (not even the members of the court themselves) can assess with certainty the extent to which this contraband prejudicial matter damaged the Petitioner's defense, just as no one can state with certainty the extent to which kidney failure contributes to the death of a person suffering from heart disease, but that there *is* damage no one can deny. It would not have been humanly possible for the court members to erase from their minds recollection of the matter to which they were exposed and even if one of them (Captain Salem) did not recall specifics, even he would have the matter brought back to mind by testimony heard during the trial. Indeed, Captain Salem frankly stated that that would probably happen with him. This gives the prosecution the advantage of having its *legitimate* evidence produced at trial emphasized and supported by the *illegitimate* evidence presented before trial. It also causes the jurors to unconsciously disregard the fundamental requirements of a criminal case and instead of resolving any doubts in favor of the accused to re-

solve them against the accused. It is well known that most people are inclined to believe what they read in the newspapers and see and hear on television news broadcasts, and when matter is fed to them every day and repeated again and again the matter is eventually accepted as "the truth and nothing but the truth".

In its opinion the Army Court of Military Review placed great emphasis on the fact that the court members told the military judge that they could follow his instructions and be impartial. The rebuttal to the assertion that the judge's cautionary instructions cure the evil was most succinctly stated by Mr. Justice Jackson in Krulewitch v. United States, 336 U.S. 440, 453, 69 S.Ct. 716, 723, 93 L.Ed. 790 (1949):

> "The naive assumption that prejudicial effects can be overcome by instructions to the jury . . . all practicing lawyers know to be unmitigated fiction."

 .It is not required that jurors be totally ignorant of the facts and issues involved in the case to be tried, and the mere existence of a preconceived notion as to the guilt or innocence of the accused is not, in itself, sufficient to rebut the presumption of impartiality *if* the juror can lay aside his impression and render a verdict based only on the evidence presented in court.

But this general rule does not foreclose inquiry whether, in a given case, the application of the rule works as a deprivation of liberty without due process.

In a number of cases in recent years the federal courts have moved away from the earlier doctrine that a denial by a juror on *voir dire* that he has been affected by damaging publications must be accepted as true, these later cases establishing the principle that adverse and inflammatory publicity has an *inherently* prejudicial impact on jurors and that it is not necessary that the prejudice be "isolated" and "demonstrated" as a prerequisite to reversal.

In Griffin v. United States, 295 F. 437 (3 Cir. 1924) newspapers had published statements made by the prosecuting attorney which were damaging to the Defendant. In reversing the conviction the Court said:

> "Yet the proper administration of justice demands that those accused of crime have a fair trial, which was impossible after the jury had read reports of the damaging confession. Whatever chances of acquittal the defendants had at the beginning of the trial vanished at the publication of those reports.

> "It is urged that there is no direct evidence that the jury read the newspaper reports. In the first place, it is admitted that the articles appeared on the front page of the newspapers, and there is no denial of the statement, made by counsel in his motion for the withdrawal of a juror, that 'members of the jury have been seen reading them.' Our opinion on this question was well expressed by Judge Acheson in the case of Meyer et al. v. Cadwalader (C.C.Pa.) 49 F. 32. The facts of that case were strikingly similar to those in the case at bar. He said:

>> 'It is idle to say that there is no direct evidence to show that the jury read these articles. They appeared in the daily issues of leading journals, and were scattered broadcast over the community. The jury separated at the close of each session of the court, and it is incredible that, going out into the community, they did not see and read these newspaper publications. That these published statements were well calculated to prejudice the jury against the plaintiffs and deprive them of a fair trial is a proposition so plain that it would be a sheer waste of time to discuss it.' " *Ibid.*, at 440.

The District Court for the Southern District of New York, in United States v. Montgomery, et al., 42 F.2d 254 (1930), speaking of the ability of a juror to

erase from his mind the salient facts published in a newspaper article reasoned as follows:

"This motion, therefore, cannot, I think, be properly disposed of by basing [my] decision on the letter of the jurors' answers to my questions. I must consider . . . the nature of the malignancy and infection to which the jurors have been exposed.

"Bearing that in mind, I have come to the conclusion that, with the best intention in the world, the jurors who read such articles . . . will not be able wholly to erase the salient facts therein contained from their minds. . . .

"In any event, however honest minded the jurors may be, such statements as were made in the objectionable articles would, I think, lurk in the background of their consciousness during their deliberations, and might, for example, cause them unconsciously to disregard the underlying requirement of a criminal case and to resolve any doubts they felt on the evidence against the Defendants."

The United States Supreme Court has on a number of occasions looked beyond the *voir dire* statements of impartiality by jurors to determine the effect of prejudicial publicity. In Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959), newspapers published evidence which had been ruled inadmissible during the trial. Seven of the jurors were exposed to the articles but *all seven swore that they would not be influenced by them,* that they could decide the case only upon the evidence of record, and that they felt no prejudice against the defendant as a result of the articles. The trial court accepted their statements at face value but on appeal the Supreme Court reversed and granted the Defendant a new trial, holding that the exposure to this inadmissible evidence (i. e. accused had previously practiced medicine without a license) was so prejudicial to the accused, who was on trial for unlawfully dispensing drugs,

that reversal was required, *despite the assertions of the jurors.*

In Irvin v. Dowd, 366 U.S. 717, 81 S. Ct. 1639, 6 L.Ed.2d 751 (1961), the Defendant was charged with a number of murders and shortly after his arrest police officers made statements that he had confessed, these statements being widely publicized. Because of the publicity a considerable number of the jury panel stated that they had formed an opinion that the Defendant was guilty. A jury was selected from among those who stated that they would not be influenced by the publicity. On appeal the Supreme Court recited the ancient rule that it is sufficient if the juror states that he can lay aside his impressions and render a verdict based only on the evidence, but then went on to say that the rule does not close inquiry to determine whether in a given case the application of the rule deprives a defendant of due process. The Court then found prejudice established despite the jurors' statements that they would be fair and impartial.

In *Marshall* and *Irvin* the Court made an examination of the facts to determine whether prejudice resulted and based upon such examination determined that the jurors were probably incapable of laying aside their opinions in view of the prejudicial pre-trial publicity. In four later cases the Supreme Court broke away from the requirement that *actual* prejudice must be shown. These four landmark cases are Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L. Ed.2d 663 (1963); Turner v. Louisiana, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965); Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) and Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966).

In *Rideau* on the day after the defendant's arrest he was interviewed in the jail by the Sheriff and during the course of the interview he made highly damaging admissions. This "interview" was broadcast by local television stations and viewed by a large part of the com-

munity. A majority of the Supreme Court held that it was a denial of due process in the circumstances to refuse the petitioner's request for a change of venue because of the pre-trial publicity. The two dissenting justices pointed to the fact that only three of the twelve jurors saw the broadcast and these three jurors expressed no opinion with regard to the petitioner's guilt and declared that their decision would be based solely on evidence at trial. The majority, however, reached their decision "without pausing to examine a particularized transcript of the voir dire examination of the members of the jury." [26]

Although publicity by the news media was not involved, the Court again invoked the doctrine of inherent prejudice in *Turner*. In that case two bailiffs who were looking after the jury during the course of the trial were also prosecution witnesses. The convicted defendant contended that the contact of these bailiffs with the jury had a damaging influence. Both of the witnesses testified that they had not spoken to the jurors about the case. In spite of the fact that the defendant could not establish any conversations or direct influences the Supreme Court reversed the conviction, recognizing the extreme prejudice inherent in the situation. The Court stated:

"The requirement that a jury's verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury.

. . . . . .

"In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel. What happened in this case operated to subvert these basic guarantees of trial by jury." (379 U.S. at pp. 472, 473, 85 S.Ct. at pp. 449–550.)

In *Estes* the defendant was convicted for swindling and the conviction was reversed because of the televising of a two-day preliminary hearing and part of the trial. No "isolatable prejudice" was shown, but the Court held that in some cases a showing of actual prejudice is not prerequisite to reversal. The Court stated:

"The State, however, says that the use of television in the instant case was 'without injustice to the person immediately concerned,' basing its position on the fact that the petitioner has established no isolatable prejudice and that this must be shown in order to invalidate a conviction in these circumstances. The State paints too broadly in this contention, for this Court itself has found instances in which a showing of actual prejudice is not a prerequisite to reversal. This is such a case. It is true that in most cases involving claims of due process deprivations we require a showing of identifiable prejudice to the accused. Nevertheless, at times a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process." (381 U.S. pp. 542, 543, 85 S.Ct. pp. 1632–1633.)

The Court also made this observation highly pertinent to our consideration of this case:

"*Television in its present state and by its very nature, reaches into a variety of areas in which it may cause prejudice to an accused. Still one cannot put his finger on its specific mischief and prove with particularity wherein he was prejudiced.*" (P. 544, 85 S.Ct. p. 1633.) (Emphasis added.)

In *Sheppard* the defendant was convicted of murder amidst massive prejudicial publicity. Prospective witnesses were interviewed by the news media re-

---

26. In the case before us it has been noted that *all* of the jurors admitted extensive exposure to the damaging pre-trial publicity.

vealing much of their testimony. Many matters unfavorable to the defense were published before and during the trial and the jurors were exposed to much of it. In reversing the conviction the Court cited its previous decisions in *Rideau*, *Turner* and *Estes*, quoting from them. In the body of the opinion the Court commented that:

"The burden of showing essential unfairness . . . as a demonstrable reality . . . need not be undertaken when television has exposed the community 'repeatedly and in depth'" to the matter damaging to the defendant. (384 U.S. pp. 351, 352, 86 S.Ct. p. 1516.)

Thus the Supreme Court has established in the line of cases above mentioned the doctrine of inherent prejudice in regard to the accused's right to a fair trial, the doctrine coming into play when, because of the circumstances, there is such a high probability that prejudice will result until the procedure is deemed inherently lacking in due process. In such cases no showing of identifiable prejudice is necessary.

In the Court's opinion the case before us represents a situation where it is not necessary for the Petitioner to show "isolatable", "identifiable" prejudice as a prerequisite to reversal. However, isolatable prejudice has been shown. One of the jurors predetermined that one of the most devastating witnesses against the Petitioner was "credible" and "straight-forward". It is difficult to conceive of a clearer instance of isolatable prejudice than this. Every juror was exposed to the massive pretrial coverage which has been heretofore described. More than ten prospective prosecution witnesses gave interviews on television, in the press, in magazines and in books. Prejudice is inherent in such a situation. All of these published statements and photographs were calculated to prejudice the triers of fact against the Petitioner and it is unrea-

sonable to presume that the triers of fact in this case were not so prejudiced.

The United States Court of Military Appeals in its opinion recognized that as a result of the media coverage:

"[b]y the time of trial few persons in the United States who read, watched or listened to the daily news would not have been convinced that many Vietnamese civilians including women and children had been killed during the My Lai operation."

The Court might well have continued by saying that anyone who read the newspapers or watched the television broadcasts, or listened to the radio broadcasts, would have been equally convinced that Calley was guilty of the offenses charged against him because this was the substance of the interviews with Meadlo, Terry, Thompson and others. The Army Court of Military Review in its opinion also observed that in its view there was "no strong consensus in the media as to what should happen to Lt. Calley" because it appeared there were "supporters" of the Petitioner who were also publicized and the court members stated that they could be impartial. What the Court of Military Review failed to recognize in this statement is that the trial was one to determine *guilt* or *innocence*, not popularity. Unlike elections, a verdict is not to be influenced by popular support or the lack of it. Guilt or innocence must result from evidence properly admitted at trial.

"Legal trials are not like elections, to be won through the use of the meetinghall, the radio, and the newspaper."[27] Bridges v. California, 314 U.S. 252, at 271, 62 S.Ct. 190, at 197, 86 L.Ed. 192 (1941).

The Army Court of Military Review also placed great emphasis on the fact that the military judge in this case did not exacerbate the situation and issued orders to witnesses and instructions to the jurors which maintained that "judicial calm and dignity required before the doctrine of inherent prejudice should

---

27. This decision antedated television.

apply". What the Court of Military Review failed to recognize was that the judicial calm and dignity created by the Court's instructions to the jurors and by the limitation of ingress and egress to the courtroom did not occur until *after* the prejudicial publicity had been disseminated and the jurors had been exposed thereto. We have already made mention of the fact that it was more than a year before the instructions even reached five of the six jurors. The military judge recognized that he had no contempt power and could not control the witnesses nor the news media. He recognized that his orders were being violated at will by the witnesses and by the media and the Department of Justice gave him no assistance whatever in enforcing them. This situation was certainly not indicative of judicial calm and dignity. For these reasons the reviews given the Petitioner's case by the Court of Military Review and by the Court of Military Appeals, which reviews ignored these salient factors, do not meet the constitutional muster required by the due process clause.

The traditional safeguards of continuance, *voir dire*, change of venue and control of the release of information by the participants in a trial were ineffective in this case.

The military judge recognized that due to the massive and intense nature of the publicity in this case continuance was an ineffective solution.

As has been recognized in the cases hereinabove cited, *voir dire* does not always achieve the desired result of protection against massive and prejudicial publicity.

█ A change of venue in the Petitioner's case would not have achieved anything whatsoever of ameliorative value. The publicity in this case did not result in a "high impact area", but instead was communitywide, statewide, nationwide and worldwide, and there was particular emphasis given to Petitioner's case within the total military community, which fact further complicated the situation because the Petitioner was tried by Army officers. As high government officials frequently stated, the case affected the entire military community and even the foreign policy of the nation. Obviously, a change of venue would have been ineffective.

As for the attempted exercise of control over the release of information by witnesses and participants in Petitioner's case, we have already seen that these efforts met with almost total disregard. Witnesses continued to sell their testimony to the highest bidder within the media. This was done in spite of the military judge's order to the contrary. The lack of a judge during the critical stage of the matter added to the damage. None of the traditional safeguards would have prevented the prejudicial effect of the publicity in the Petitioner's case, due in large part to the fact that the military system which tried Petitioner was inadequately prepared to protect his right to a fair trial. The Constitution must require more.

█ The record in this case shows that the Petitioner's trial was affected by isolatable demonstrated prejudice and by inherent prejudice to such an extent that the Petitioner was denied due process. Judged by every standard established by the decided cases, his conviction should be set aside. Stated otherwise, if there has ever been a case in which a conviction should be set aside because of prejudicial publicity, *this is it*.

This opinion of the Court should not be construed as holding that if an individual who is charged with offenses achieves sufficient notoriety as a result of his alleged acts the charges should be dismissed. The guidelines enunciated by the Supreme Court in the *Sheppard* case contain the remedies for pre-trial publicity problems created by the great majority of cases. Unfortunately, the court-martial system could not and cannot effectively invoke some of these guidelines. What the Court holds is that an individual should not be required to stand trial by his government without

protection from the publication of prosecution "testimony" against him in advance of trial and the sale of evidence to the highest bidder to be used against him; that every citizen of this nation, no matter how notorious, has the right to be tried in a court, whether military or civilian, that can protect him against prejudicial coverage by the news media; that an accused should not be tried by a court which must announce that it is powerless to enforce its own orders; that a court or a system within the constitutional framework of our nation that is so sterile that it cannot protect the accused from such publicity denies him due process; that the accused should not be tried by jurors who are members of an organization which is in some respects itself on trial; that if investigation by the press and public comment by government officials is accorded such high value that it must prevail, then the exercise of those rights should not be enjoyed at the expense of the accused's right to a fair trial.

In balancing the right of the press to disseminate news and the right of the accused to have his trial conducted in an atmosphere free from the prejudicial effect of such news coverage, we deal with two separate guarantees of the Constitution which are in direct conflict. Neither guarantee is predominant over the other. Rather, these guarantees must be viewed separately and they both must be observed. Where the guarantees conflict, neither may give way. The right of a free press embodied in the First Amendment is guaranteed. The individual's right to a fair trial guaranteed by the Fifth Amendment's due process clause and in the other individual provisions of the Bill of Rights is absolute. This opinion does not denigrate the right of the press to publish news matter, but it does hold inviolate the individual's right to a fair trial. Any other decision would in the Court's opinion so emasculate the individual's right to a trial free from bias and prejudice as a result of outside influences that the due process clause would become nothing

more than idle words availing nothing. This opinion simply places the burden on the government and the military system to protect the individual rights of the person criminally accused.

## II.

## THE DENIAL OF COMPULSORY PROCESS AND CONFRONTATION ISSUE

### A.

The Sixth Amendment to the Constitution of the United States provides:

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

There is perhaps no right under our nation's Constitution more fundamental to the concept of fair trial than is this right of the accused to confront witnesses and to have process issue to compel attendance of witnesses. This right to offer testimony of witnesses and to compel their attendance is, in essence, the right to present a defense, and a fundamental element of due process of law. Washington v. Texas, 388 U.S. 14, 87 S. Ct. 1920, 18 L.Ed.2d 1019 (1967). In addition, it is not always necessary that the defense comply with every technical procedural requirement before being entitled to compulsory process. Braswell v. Wainwright, 463 F.2d 1148 (5 Cir. 1972). One standing accused of criminal acts may not be denied those witnesses whom it is believed would aid in his defense. The fundamental rights of confrontation and compulsory process inherent in the due process clause of the Fifth Amendment and embodied specifically in the Sixth were, in the Court's opinion, denied Petitioner during his trial.

During the hearing of his case Petitioner asserted that he had been deprived of due process of law as a result

of command control and influence exerted by superiors in the military chain of command. According to the military cases there is perhaps no evil in the military system more condemned than that of improper command influence. See United States v. Hedges, 11 USCMA 642, 29 CMR 458 (1960); United States v. Coffield, 10 USCMA 77, 27 CMR 151 (1958); United States v. Sears, 6 USCMA 661, 20 CMR 377 (1956); United States v. Luttrice, 3 USCMA 487, 13 CMR 43 (1953). This condemnation of improper influence coincides with the requirements of an impartial hearing under the Fifth Amendment as interpreted by the Supreme Court and other Article 3 courts. Improper influence outside the courtroom, from whatever source, is condemned. A fair trial is guaranteed only by a panel of impartial, indifferent and unbiased jurors, and jury findings must be based solely upon evidence offered in open court, unbiased and uninfluenced by anything that the jurors might have heard or seen outside the actual trial of the case. Nearly 150 pages of the record of trial in this case are devoted to argument concerning the command control issue. The military judge ruled that the defense had made a *prima facie* showing of command control and placed the burden on the prosecution to dispute this showing. It was the Petitioner's position that those entrusted with the fair administration of justice in the pre-trial processing of his case had been wrongfully influenced by their superiors; that the decision to prosecute him was made by the President of the United States and that this information was passed down the chain of command to those who preferred, investigated, and referred the charges to trial.[28]

To rebut the *prima facie* case the prosecution subpoenaed Major General Talbott, Brigadier General Oscar E. Davis, Colonel Robert M. Lathrop, Lieutenant Colonel Henry E. Vincent, Lieutenant Colonel Dwayne C. Cameron, and Lieutenant Colonel Frank L. Garrison, all as witnesses for the prosecution. They testified in essence that they had not been influenced by their superiors. In order to rebut their testimony and to prove the Petitioner's case concerning command influence, Petitioner's counsel requested that the trial counsel, the prosecutor, subpoena certain witnesses including Secretary of Defense Melvin R. Laird, Secretary of the Army Stanley R. Resor and Chief of Staff of the Army General William C. Westmoreland.[29] When the trial counsel refused to subpoena these witnesses, the defense counsel presented a written petition to the military judge which read:

Comes now the accused First Lieutenant William L. Calley, Jr. and petitions the Trial Judge to order Trial Counsel to have the following persons subpoened [sic] to testify for and on behalf of the accused at a deposition to be held before the Trial Judge at Fort Benning, Georgia, on January 20, 1970, at the hour of 10:00 A.M.:

Secretary of Defense Melvin R. Laird

Secretary of the Army Stanley R. Resor

Chief of Staff of the Army General William Westmoreland

Chief, Trial Judiciary, Colonel Carl G. Moore

The testimony of these witnesses prior to hearing is necessary to establish that the Constitutional rights of the accused have been violated; that Command Control has interferred [sic] with the due process of law and equal protection of the law required by the V and XIV Amendments to the Constitution of the United States and

---

28. The military judge's finding of the *prima facie* case of command influence was correct in that the defense presented media reports which squarely raised the specter of improper influence.

29. Under the Uniform Code of Military Justice the Trial Counsel (prosecutor) is empowered to subpoena witnesses for both sides. Article 46 UCMJ; Paragraph 115A, Manual for Courts Martial, United States (1969 Rev. Ed.).

the provisions of the Uniform Code of Military Justice; and, to verify the substance of the statements involving the accused made by the witness in his official capacity with the United States Army to the news, television, radio and other media and before Congress.

The accused Lt. William L. Calley, Jr., further petitions the Trial Judge to order and have Trial Counsel issue a subpoena duces tecum to the above-named individuals to obtain and have available for use at the deposition all records, memoranda, orders, entries and other documents prepared or issued by them or in their possession or the possession of any subordinate person or unit which involves any matter dealing, or in any way connected, with the investigation, the preferring of charges, the nature of the offenses to be charged, and the selection or designation of the individuals and persons who have been detailed to assist in any trial and pretrial activities leading up to the investigation, detection, preferment of charges and other matters pertaining to the alleged offenses. (App. Ex. 35.)

In a further oral offer of proof, the Petitioner's counsel stated:

I would expect Secretary of Defense Laird to testify that in the conference —that he went to the President of the United States and in a conference with the President of the United States, he in substance and effect said, "We have to prosecute Lt. Calley for murder." And the President said, "That is fine with me." I would expect the Secretary of Defense to say that. I would expect the Secretary of Defense to say that upon receiving those orders, he contacted Secretary of the Army, Stanley Resor, and told

him that he had cleared it with the President of the United States and that he, Secretary Resor, was to go ahead and have Calley prosecuted. I would expect Secretary Resor to come in and say that when he received that information from Secretary of Defense Laird, he went to the Chief of Staff and directed that the proceedings be brought upon Lt. Calley for first degree murder. I would expect that the Chief of Staff would say that the command was carried right down the chain of command to the commanding general here at Ft. Benning, Georgia, and he was told in substance and effect that the matter had been cleared from the top and Lt. Calley was to be convicted—to be charged— excuse me—to be charged with first degree murder. I would say that that information went right on down to the people who prepared the charges and specifications and in those instances where they signed the charges and specifications, they were influenced by the direction from on high.

The military judge denied the Petitioner's subpoena on "procedural grounds", stating that the request for subpoenas "doesn't comply with the law in setting out with specificity what the defense wants". The military judge remarked that he would reconsider the petition if, after interviewing the witnesses, the defense presented a clear showing of necessity, materiality and relevancy. The denial became the final ruling as to the requested subpoenas. It is difficult for this Court to see how the defense failed to comply with the procedural requirements of Paragraph 115A of the Manual for Courts Martial, United States, 1969 (Rev.Ed.).[30] Be that as it may, the Court is constrained to hold that even if there was some technical non-compliance with procedure here the

---

30. Paragraph 115A provides in pertinent part:

A request for the personal appearance of a witness will be submitted in writing, together with a statement signed by the counsel requesting the witness, containing (1) A synopsis of the testimony that it is expected the witness will give, (2) Full reasons which necessitate a personal appearance of the witness, and (3) Any other matter showing that the expected testimony is necessary to the ends of justice.

Petitioner was nevertheless entitled to the presence of these witnesses.

The issue of command control and influence improperly imposed on those who determined Petitioner's fate was a live issue at Petitioner's trial. After development of a *prima facie case* demonstrating such control, it is necessary that the Petitioner be given an opportunity to rebut the prosecution's evidence to the contrary. A cursory glance at the statements of the President of the United States and General Westmoreland set out in Section I of this Opinion, indicating their intention to fully prosecute those involved in the My Lai incident pursuant to the Uniform Code of Military Justice and to punish those found guilty indicates great interest on the part of these individuals. The shock and dismay expressed in the statements by Secretary Laird and Secretary Resor, similar to those of the President and General Westmoreland, indicate their intense interest in the Petitioner's case.[31] There can be little question that the requested testimony was both relevant and material on the issues of command control and pre-trial publicity.

 This Court is not disposed to accept the Respondents' argument that a personal interview with the requested witnesses was a prerequisite to the issuance of a subpoena. There is nothing in the military law, nor in the law in the civilian courts, that requires a personal interview with witnesses before they are required to attend. Compulsory process applies to those witnesses who are "relevant and material", and if the request is not "frivolous" in nature it should be granted. United States v. Hathcock, 441 F.2d 197 (5 Cir. 1971). In addition, technical violations of procedure should not be allowed to emasculate the efficacy of the constitutionally required compulsory process.

Braswell v. Wainwright, 463 F.2d 1148 (5 Cir. 1972). There is no indication that the Petitioner's request for subpoenas was "frivolous". Logic dictates, furthermore, that evidence as to what a witness will say when called to testify may come from many different sources, exclusive of a personal interview, including the news sources relied upon by the Petitioner herein.

Relevancy obtains not only to the testimony as to the guilt or innocence of the accused, but to the testimony on such other matters as may be relevant to the disposition of the case. The right to compel a witness's testimony becomes particularly important when the expected testimony might be incriminating to that witness himself. For this reason courts have been disposed to guarantee the right of compulsory process to obtain a codefendant to testify at an accused's trial. Thompson v. State, 480 S.W.2d 624 (Tex.Cr.App.1972). No more reason exists to deny the presence of a witness who may incriminate himself. To require an interview of such a witness operates as a license to refuse to grant a subpoena simply when the witness denies the expected testimony.

Petitioner further argued strenuously that there was sufficient reason for the exercise of improper influence in his case by *his superiors* because of the very nature of the charges against *him*. He argued that under the laws of war his superiors could be charged themselves for not prohibiting his act under the precedents set at Nuremburg and in the case of In re Yamashita, 327 U.S. 1, 66 S.Ct. 340, 90 L.Ed. 499 (1945). Indeed, the press drew the same conclusions in many of their reports concerning the incident in which the Petitioner was alleged to have participated. As was pointed out by the Petitioner in his brief on the merits herein, the chief

---

31. The Court here notes that the publicity issue discussed *supra* is closely connected with the allegations of improper command influence in Petitioner's trial. In considering the totality of the adverse effect of the denial of the presence of these witnesses with the prejudicial effect of their statements to the public, the Court is of the opinion that their appearance as witnesses at Petitioner's trial was absolutely necessary after he had so requested.

United States prosecutor at the Nuremburg trials stated that Petitioner's superiors, in particular General Westmoreland, stood "a very strong possibility that [he] would come to the same end that [Yamashita] did." Certainly these precedents set the stage for an argument that the Petitioner's superiors could well have been worried about their own possible criminal responsibility as a result of the My Lai incident.[32] Be that as it may, it is not necessary that this Court come to the conclusion that these superiors were or were not responsible. It is only necessary that one be able to drawn an inference that there was reason to believe the superiors had cause for concern as to their own status.[33] Moreover, even after the testimony of those who denied that there was command influence involved in the pre-trial preparation of Petitioner's case, a circumstantial case for improper influence remained. The facts indicate that, in addition to the public statements made by the President, the Secretary of Defense and General Westmoreland, those at Fort Benning entrusted with the independent decision were well aware of their superiors' feelings in the matter. For example, the convening authority testified that he had read in the newspapers and magazines that the President, after Secretary of Defense Laird said something about having to charge Lt. Calley, had stated: "That's fine, that's alright with me". The convening authority's chief legal adviser testified that:

"I was told that the matter had gone to the West Coast and back, at this time the President was in his White House at San Clemente, California. I was told this either by Colonel Chilcoat or Colonel O'Donnell who works in the same office as Colonel Chilcoat."

He further testified that he knew the matter had been first to the Secretary of the Army and from there to the Secretary of Defense and finally to the President himself. In his own notes the convening authority's legal adviser had written a notation that the Defense Secretary had made a statement to the effect that all parties apparently committing crimes in My Lai Four in March of 1968 will be prosecuted. Those who were the accusers,[34] Captain Hill and Lieutenant Colonel Vincent, were in the office of their superior when the following transpired:

Colonel Marlow stated to Captain Hill that "You know this thing has gone to the President." And Captain Hill answered "Yes" and that he wanted to advise him that regardless of any decision the President might make, that they were not bound under the Uniform Code of Military Justice; if they thought a crime had been committed, they could prefer the charges against Lieutenant Calley. Colonel Marlow stated that if he had reason to believe a crime had been committed he realized that the charges could still be preferred regardless of the decision in Washington that he knew that he was free to do what the President wanted or not, and that *if he didn't do what the President said, "He would either be a fool or a jackass and he was inclined to believe the latter"*. (Emphasis added.)

32. Indeed, an article entitled "Command Responsibility for War Crimes" appearing in Vol. 62 of the Military Law Review, a publication of the Army, has this as its first sentence on page 1: "The Vietnam conflict and the abberation which occurred in the subhamlet of My Lai (4) in Song My Village, Quang Nai Province, in the Republic of South Vietnam on March 16, 1968, reawakened questions concerning the responsibility of a military commander for the unlawful acts of his subordinates."

33. It is inconceivable that, after the media drew the parallel between Petitioner's superiors and those tried at Nuremburg and General Yamashita, these superiors would not be concerned about their own personal status. At the very least, a permissible inference may be drawn that they were for our purposes here.

34. An accuser under the Uniform Code is he who prefers charges against the accused. See Article 1(9) and 22(b) UCMJ.

After various calls were made to the Military Justice Division of the Judge Advocate General's Office, charges were preferred. Twice, during the decision-making process, those at Fort Benning received messages from their superiors to hold up any decisions because they would be receiving additional information through channels.

Further involvement of superiors in the chain of command is suggested by the fact that the Congress of the United States was notified on the 5th of September, 1969, that charges would be preferred against the Petitioner. There was some controversy as to whether the letter informing Congress said "would be preferred" or "may be preferred". But this controversy points up the necessity of having those witnesses subpoenaed who were requested by Petitioner to testify as to their involvement in the pre-trial processing of his case. General Westmoreland had congratulated "C" Company for a job well done some two weeks after the assault on My Lai Four. The first Army-wide investigation into the incident was conducted in a "confidential" manner and personally for the Army Chief of Staff. Those in command at Fort Benning were instructed by their superiors that Lt. Calley was not to be reassigned. At one time those at Fort Benning had made the independent decision that they did not have reason to retain the Petitioner on active duty for charges. When this became known the Department of the Army sent down a briefing team to Fort Benning which "briefed" them "in detail" on the matter and, as a result, charges were preferred against the Petitioner. Those at Fort Benning received instructions concerning the way that Petitioner was to be treated. As stated above, twice they received instructions to hold up everything until further in-

structions were received through channels. Those at Fort Benning who were drafting the charges actively sought the assistance of the Judge Advocate General's Office in Washington in the drafting. They received instructions from the Assistant Judge Advocate General of the Army that the specifications would not be drafted as a violation of the laws of war but rather as a violation of Article 118 of the Uniform Code of Military Justice.[35] The Staff Judge Advocate's Office at Fort Benning was forced to install a Xerox Telecopier so that those interested in Washington could keep close tabs on what was taking place. In an unusual occurrence a copy of the pre-trial investigation was required to be supplied to the Department of the Army in Washington. Continuous extracts of typed but unauthenticated transcripts of the pre-trial hearings were forwarded to the Department of the Army.

While this Court does not conclude, as a matter of fact, that the Petitioner proved his case of improper influence,[36] yet we cannot conclude that it was so clearly disproved that the witnesses requested should not have been called. Certainly their testimony was relevant. A judge of the highest military court has said:

"As members of a hierarchial system, with promotion and type of duty largely dependent upon the rating of superiors, military personnel would naturally tend to regard all policy as mandatory." [37]

Everybody from the Commander in Chief on down had certainly made it clear to everybody at Fort Benning what the "policy" was in the Calley case. In such a situation the Sixth Amendment required that those witnesses sought to be subpoenaed by the Petitioner should have been called, and the military judge's refusal to subpoena them violat-

---

35. The Court notes that this same Assistant Judge Advocate General rates the judges of the Army Court of Military Review which reviewed Petitioner's conviction. This is further indication of influence.

36. Nevertheless, it is the opinion of this Court, after reviewing the record, that there was indeed improper influence in Petitioner's case.

37. Quinn, 35 St. John's Law Review, 255, 256 (1961).

ed the Petitioner's right to due process of law.[38]

There was yet another denial of a subpoena for a defense requested witness by the military judge which is worthy of consideration. Prosecution witness Dennis Conti testified that Petitioner was a participant in the killings at My Lai and his testimony further accused the Petitioner of certain *uncharged* misconduct. However, Conti denied any misconduct of his own. Petitioner's counsel made a written request for the subpoena of John Tunstal as a witness in order to impeach Conti's damaging testimony. The record shows that the defense wanted to subpoena Tunstal because they believed he would testify that Conti was biased against the Petitioner as a result of the Petitioner's having disciplined Conti for a sexual assault on a Vietnamese woman. The written request for the subpoena was denied by the military judge because the defense did not furnish "an affidavit that Tunstal would testify that this rape occurred, that Calley was present . . ."[39]

 The Respondents argue that defense counsel failed to show the expected testimony of Tunstal to be relevant, material and specific. Clearly, the expected testimony of Tunstal, as stated by defense counsel in their motion, would expressly contradict Conti's denial of any wrongdoing. Its relevancy as matter to impeach Conti's testimony is obvious. The credibility of a witness is relevant and material in any trial. Moreover, the bias and prejudice of a prosecution witness against an accused is likewise relevant and material. The prosecution made no assertion of record that the defense showing was untrue or frivolous. It may be that, as the Respondents admit, it was established at trial that Conti was hostile to Petitioner because Peti-

38. In addition, the testimony of General Westmoreland was alleged to have been relevant to the issue of jurisdiction concerning Westmoreland's personal interest in the outcome of the Petitioner's case. It was the Petitioner's position that this personal interest deprived the convening authority of jurisdiction to convene the court-martial. While I do not address myself to this issue, it appears from a study of the opinion of the Army Court of Military Review below, that the decision of the Army Court was in direct conflict with an earlier decision of one of its sister courts in Coast Guard, United States v. Chavers, 23 CMR 701 (CGBR 1957). In an aside, further, it is noted that the Court of Military Review stated that the Petitioner's claim at trial and on direct appeal that General Westmoreland had a "personal interest" in the outcome of Petitioner's case "has not been made out factually". The obvious question that arises from such a statement is that the Petitioner may well have been able to make out his claim of personal interest on the part of General Westmoreland had he been able to call the General as a witness which he sought to do or had he been given access to the General's testimony before the House Armed Services Subcommittee investigating the My Lai incident. The Petitioner was denied both. The United States Court of Military Appeals did not see fit to review the jurisdictional question concerning the personal interest of General Westmoreland and, thus has not re-

solved the conflict between the two subordinate courts. Therefore, this court cannot conclude that the Petitioner would have been unable to make out a case of personal interest on the part of General Westmoreland had he been allowed to subpoena the General or to have access to his testimony before the House Armed Services Subcommittee. Certainly, the report of the House Armed Services Committee indicates that the General had a personal concern in seeing that his directives concerning the treatment of civilians were carried out. Had the petitioner been able to make out his factual case, it is not unreasonable to assume that the United States Court of Military Appeals would have reviewed the conflict between the legal opinions of the two lower courts. Since the United States Court of Military Appeals is limited to a review of law and not of fact, the factual conclusion reached by the Court of Military Review preempted the Court of Military Appeals' decision in this regard. I conclude that the Petitioner was denied his Sixth Amendment right to confrontation and compulsory process by the refusal of the military judge to call General Westmoreland as a witness in order that the Petitioner might attempt to make out his factual case.

39. This denial was based on Paragraph 115A of the Manual for Courts Martial, United States, 1969 (Rev. Ed.), but we note that Paragraph 115A does not require an affidavit.

tioner had disciplined him for his sexual misconduct. It is impossible to determine, however, that Conti was in fact impeached in the minds of the jurors. The Court finds, therefore, that the defense assertions were more than "intriguing speculations", thus distinguishing this case from United States v. De Stefano, 476 F.2d 324, 330 (7 Cir. 1973). Respondents argued that even if there was error here, it was harmless inasmuch as Conti was thoroughly impeached without Tunstal's testimony.[40] This Court is, however, unable to rule that the refusal to subpoena a witness who was expected to testify as to Conti's bias and veracity was insignificant or harmless. It must be remembered that Conti had expressly testified that Petitioner was a participant in the killings at My Lai, and that the Petitioner was convicted of *exactly that*. Therefore, the Court finds that the refusal to subpoena John Tunstal deprived Petitioner of a constitutional right, when considered along with the failure to produce other relevant witnesses. To hold otherwise would require this Court to engage in a guessing game not prescribed by the Constitution.

 Neither the requests for subpoenas of Secretary Resor, Secretary Laird, or General Westmoreland nor the request for a subpoena of John Tunstal was frivolous; nor were defense counsel's allegations in support thereof proven untrue. See Greenwell v. United States, 115 U.S.App.D.C. 44, 317 F.2d 108 (1963). The fact that three of the requested witnesses were high ranking officials in the Army's structure of command does not excuse the refusal to issue subpoenas. The right of the Petitioner to have compulsory process may not be sidestepped merely because of inconvenience. Holman v. Washington, 364 F.2d 618 (5 Cir. 1966). Nor is it an answer

to say that the testimony of Tunstal would have been "cumulative". Some of the testimony sought by those subpoenas could well have obtained a different result in Petitioner's trial. Once it is established that the subpoena is relevant on any issue, it should be granted as mandated by the due process clause of the Fifth Amendment and the compulsory process provision of the Sixth Amendment. United States v. Hathcock, 441 F.2d 197 (5 Cir. 1971).

The Court finds, therefore, that the refusal by the military judge to issue the defense subpoenas requested amounted to a violation of the Petitioner's rights under the Fifth and Sixth Amendments to the Constitution and requires the grant of the relief which the Petitioner seeks. It clearly appears that these constitutional issues were not fully and fairly considered in the military judicial system. In fact, neither of the reviewing courts, the Army Court of Military Review and the United States Court of Military Appeals, so much as mentioned this issue.

B.

During the court-martial of the Petitioner the Armed Services Subcommittee of the House of Representatives conducted an investigation into the My Lai incident. During this investigation numerous witnesses were called who later appeared at the trial and testified for the prosecution against the Petitioner. Other witnesses were called by the court members who sat in judgment on the Petitioner. The Subcommittee's report of its investigation was published in July, 1970, some four months before the Petitioner's actual trial on the merits began. The day after this report was published, Petitioner, pursuant to the provisions of Title 18 U.S.C. § 3500 and the ruling in Brady v. Maryland, 373 U.

---

**40.** In support, the Respondents argue that (1) It was established at trial that Petitioner disciplined Conti for his illicit sexual activities; (2) Charles Hall testified that Petitioner stopped Conti's sexual advance; (3) Petitioner corroborated Hall's testimony; (4) Conti admitted taking VD penicillin pills; (5) Defense witness, Oliver, testified he saw Conti using marijuana on March 16, 1968; and (6) Defense witness, Bacon, testified as to Conti's bad reputation for truthfulness.

S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), filed a motion to discover the testimony of the witnesses before the House Subcommittee. This motion was reiterated and renewed throughout the course of the trial. The military judge found that the testimony sought *was relevant and important to the Petitioner's case* and ordered the trial counsel to serve a subpoena duces tecum on Congress to obtain the testimony. The subpoena was evidently ignored because the military judge caused a new subpoena to be served in February, 1971. The matter was never presented to the Congress as a whole and the subpoena was again ignored. The military judge refused to rule specifically on whether Title 18, § 3500, of the United States Code was applicable to the testimony before Congress and denied the Petitioner's motion to discover on the basis that the Petitioner had access to statements made by these witnesses to "other investigations".

Title 18 U.S.C. § 3500, otherwise known as the "Jencks Act", provides (in pertinent part):

"(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement . . . of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified.

. . . . . .

"(d) If the United States elects not to comply with an order of the court under subsection (b) or (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared."

It will be observed that the Jencks Act requires production of *"any statement"* of the witness, regardless of time, place or nature of the statement. In fact, subsection (e) defines a statement simply as "a written statement made by said witness" or a "recording, or a transcription . . . of an oral statement made by said witness." It is also clear that the statement need not be made to or held by the prosecution; any statement held by any part of the United States Government is covered.

 The Court of Military Review held that the Jencks Act was inapplicable to the testimony given before the Subcommittee of the House of Representatives investigating the My Lai incident. They reasoned that the words "United States" as used in the Act, did not encompass the Congress; that the doctrine of separation of powers dictated such a reason; and that even if their reasoning was erroneous there was no prejudice as a result of the military judge's failure to strike the testimony of the numerous witnesses in spite of the dictates of the Act. The Court of Military Appeals did not consider the question.[41] It is the opinion of this Court that the Court of Military Review erred in its holding that the Jencks Act had no application in the circumstances.[42]

The definition given the term "United States" by the Court of Military Review is too restrictive. In applying the Jencks Act the federal courts have not restricted the duty of disclosure to the *person* of the prosecutor, but have extended it to "the government as a whole". United States v. Bryant, 142

41. The Jencks Act unquestionably applies to military proceedings. Augenblick v. United States, 377 F.2d 586, 180 Ct.Cl. 131 (1967), reversed on other grounds, 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969); United States v. Albo, 22 USMCA 30, 46 CMR 30 (1972); United States v. Walbert, 14 USCMA 34, 33 CMR 246 (1963); United States v. Heinel, 9 USCMA 59, 26 CMR 39 (1958).

42. A scholarly discussion of this question which comports with the ruling here made appears in the Yale Law Journal, Vol. 80: 1388 (1971).

U.S.App.D.C. 132, 439 F.2d 642 at 650 (1971).[43] When the United States prosecutes an individual the prosecution may take place in the person of the counsel trying the case on behalf of the government, but the government encompasses more than just the prosecutor. The United States—the whole—is represented by the prosecution. If any part of the whole retains possession of evidence which would be exculpatory, release of the evidence is required (Brady v. Maryland, *supra*) because the government of the United States should be treated "as a unit rather than as an amalgam of separate entities". S & E Contractors v. United States, 406 U.S. 1, 10, 92 S.Ct. 1411, 1417, 31 L.Ed.2d 658 (1972).

■■ Moreover, it appears to the Court that the Petitioner's reasoning concerning the issue of separation of powers is the only acceptable position in this case. The Court of Military Review stated that to apply the Jencks Act to the testimony given before the Congress would cause a constitutional problem involving separation of powers.[44] The fundamental basis of the separation of powers doctrine is that each of the three branches of government, possessing their enumerated powers, may not infringe on the powers given to the other branches of government. The government of the United States is one of enumerated powers. McCulloch v. Maryland, 17 U.S. 316, 4 L.Ed. 579 (1819). The different branches have no power that is not defined and limited by the Constitution. United States v. Cruikshank, 92 U.S. 542, 551, 23 L.Ed. 588 (1876). As was pointed out by the Petitioner in his brief and in oral argument, the military system of justice and the courts created thereunder were created pursuant to the powers given to Congress under Article 1 of the Constitution.

"The express authority of Article 1, Section 8, Clause 14, of the Constitution, to make rules for the government and regulation of the land and naval forces, is a grant of purely legislative power, and is the prime source of the establishment of the system of military justice." [45]

It is elementary that in order to have a separation of powers problem there must be a conflict between the enumerated powers of the different branches. Since the military justice system derives its power from Congress it is hard for the Court to understand how there may be conflict in the "separation of powers" context, since there is only one power involved.[46]

If the Jencks Act applies to the testimony given by the witnesses before the House Armed Services Subcommittee who later testified against the Petitioner at trial, there can be little question that their testimony should have thereafter been stricken.

But even if it should be determined that the Jencks Act does not apply, there nevertheless was a clear violation of Petitioner's constitutional right to confrontation and compulsory process resulting from the refusal of the Congress to honor the subpoenas issued by the military judge.

While there was no direct response from the Congress to the subpoena duces

43. The duty of disclosure of evidence obtained by Congress is to be governed by the same rules as applied to the other branches. See Christoffel v. United States, 91 U.S. App.D.C. 241, 200 F.2d 734, 738–739 (1952).

44. Simply because the constitutional problem arises regarding separation of powers does not limit the individual's right to a fair hearing of his case and his right to present his defense.

45. Snedeker, Military Justice Under the Uniform Code (1953).

46. The military judge's role as an officer in the Army is not in conflict with his role as a military judge. He derives his officership from the executive branch and is a member thereof, but his military judge powers are derived under Article 1 of the Constitution, the legislative power. Apart from those powers given him by the Uniform Code of Military Justice as a military judge, he has no judicial powers.

702

tecum issued by the military judge, the position of the Chairman of the Subcommittee was found out in a letter to the trial counsel which read:

Dear Captain Daniel:

This is in response to your letter dated July 16th asking the position of the Subcommittee relative to the defense request for discovery of testimony, evidence and unreleased hearing reports resulting from our investigation of the My Lai incident.

As you know, the Constitution created the Congress as an independent branch of the government, separate from and equal to the executive and judicial branches. As a separate branch, it is our belief that only the Congress can direct the disclosure of legislative records. Therefore, it is our position that the My Lai Subcommittee documents demanded by the defense counsel are not within the purvue of the holding in Brady v. Maryland, 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215] (1963). For the same reason we believe that those documents are not subject to the requirements of 18 U.S.C. 3500. Accordingly, the documents demanded by defense counsel will not be made available.

Sincerely,
/S/ F. Edward Hebert
Chairman, My Lai Incident
Subcommittee [47]

In September, 1970, the Petitioner renewed his demand for discovery of the testimony given before the Subcommittee and filed a brief in support of his right to discover alleging that the right is established under the Fifth, Sixth and Ninth Amendments to the Constitution of the United States, the military rules of discovery embodied in the Uniform Code of Military Justice and the Manual for Courts-Martial, and under the inherent power of the court to order discovery. On October 13, 1970 the military

judge denied the defense motion for discovery of the requested testimony.

Notwithstanding his ruling of October 13, 1970, the military judge renewed his order and a subpoena duces tecum was issued again in February, 1971. This subpoena was likewise ignored. The requested materials were never released by Congress to either side nor were they released to the court for inspection *in camera*, notwithstanding the military judge's orders.

The Court of Military Review noted that the order to the House of Representatives to respond to the subpoena duces tecum was "necessarily precatory". Certainly, any subpoena issued by a court to any other branch of the federal government seeking information which might be privileged would necessarily be precatory in one sense. The branch receiving the subpoena may assert its privilege. However, when the privilege is claimed there may well be a conflict between the right of the individual accused to compulsory process and discovery on the one hand and the privilege asserted on the other. There can be little question that there is a privilege resting with the House of Representatives to protect its legislative processes. The question remains, however, as to what occurs when the assertion of the privilege conflicts with the individual's right to due process.

There is no doubt about the relevancy of the requested testimony. The military judge recognized this fact when he ordered the subpoenas to be issued— three times. A cursory glance at the list of witnesses who testified before the House Subcommittee indicates relevance as well. For example, the Secretary of the Army and General William C. Westmoreland testified before the Subcommittee. They were requested witnesses on the issues of publicity, command influence, and jurisdiction. Their presence was denied to the Petitioner as delineated in Section II(A) of this opin-

47. There is no evidence that the Congress ever passed on the requested subpoena issued by the military judge.

ion. Among the witnesses who testified before the Committee and at Petitioner's trial were Captain Medina and Chief Warrant Officer Thompson. As noted in Section II(A), *supra*, their testimony was critically damaging to the Petitioner. Similarly, Ronald Haeberle, Jerry Culverhouse, Colonel Oran Henderson, Captain Eugene Kotous, Lenny B. Lagunoy, Major Frederick Watke, Major Calhoun, Sergeant Stephens, Sergeant Warren, Lawrence Colburn, and Calvin Hoddeal testified before the House Subcommittee and later at the Petitioner's trial. These witnesses, particularly Haeberle, Medina, Henderson and Thompson were strong witnesses against the Petitioner. Had he been able to impeach their testimony the Petitioner's chances for acquittal would have been greatly augmented.

 Part and parcel of the right of confrontation, and of the compulsory process concomitant therewith, is the right to cross-examine the witnesses against the accused. Dowdell v. United States, 221 U.S. 325, 31 S.Ct. 590, 55 L. Ed. 753 (1911). It is through the process of cross-examination that an accused is able to impeach the witnesses against him by eliciting answers which impugn the witness's veracity, his impartiality and his capacity to observe and recall. One of the most frequently used and effective techniques of cross-examination is the use of prior inconsistent statements. That is why defense counsel in this case wanted to see the prior statements of these witnesses. To deny the accused his right to impugn a witness's testimony is to deny the accused cross-examination, and the denial of the right to cross-examine denies him due process. Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Therefore, it is clear that the constitutional right involved in the Petitioner's request for the testimony given by these later witnesses involves the Sixth Amendment right of the Petitioner to confront those witnesses against him.

 While the power of Congress to investigate for legislative purposes is in-

herent, it is not unlimited. Watkins v. United States, 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957). The power to investigate is always subject to the limitations imposed by the individual guarantees of the Bill of Rights. Quinn v. United States, 349 U.S. 155, 75 S.Ct. 668, 99 L.Ed. 964 (1955). See also Kilbourn v. Thompson, 103 U.S. 168, 26 L. Ed. 377 (1881).

 A congressional investigation and a prosecution may continue simultaneously. One does not preclude the other. As Mr. Justice Brennan stated in his concurring opinion in Hutcheson v. United States, 369 U.S. 599, 82 S.Ct. 1005, 8 L.Ed.2d 137 (1962):

"When a Congressional inquiry and a criminal prosecution cross paths, Congress must accommodate the public interest in legitimate legislative inquiry with the public interest in securing the witness a fair trial." (p. 624, 82 S.Ct. p. 1018.)

Members of Congress and the Congress in general are given certain privileges of a general nature under the Constitution. The Supreme Court has, nevertheless, often spoken as to the scope of the privilege of immunity and confidentiality and has consistently exercised the power to construe and delineate claims arising under the express powers. Doe v. McMillan, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973); Gravel v. United States, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972); United States v. Brewster, 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972); United States v. Johnson, 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966).

*Article I of the Constitution* provides:

"Each House shall keep a Journal of its Proceedings, and from time to time publish the same, excepting such Parts as may in their Judgment require secrecy."

The generalized constitutional privilege of the House of Representatives to make confidential and secret its deliberations and the statements made before it has

been implemented by the Congress in the Rules adopted by it.

Whatever its source, the question here presented is whether the privilege claimed by the House of Representatives or, in this case, by one of its subcommittee chairmen, is an *absolute* privilege or is limited by application of the Bill of Rights. The answer to this question is made obvious and easy by the recent "definitive" decision of the Supreme Court in the case of United States v. Nixon, President of United States, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). In that case the District Court for the District of Columbia by subpoena duces tecum directed the President to produce certain recordings and documents relating to conversations with aides and advisers in order that this evidence might be used in a criminal proceeding in that court. The President resisted the subpoena, claiming "executive privilege". The Supreme Court held that the assertion of privilege must yield to the need for evidence in a pending criminal trial and the fundamental demands of due process of law in the fair administration of justice. Quoted below are excerpts from the Court's opinion:

> "The first contention is a broad claim that the separation of powers doctrine precludes judicial review of a President's claim of privilege. The second contention is that if he does not prevail on the claim of absolute privilege, the court should hold as a matter of constitutional law that the privilege prevails over the subpoena duces tecum.

> . . . . . .

> "However, neither the doctrine of separation of powers, nor the need for confidentiality of high level communications, without more, can sustain an absolute, unqualified presidential privilege of immunity from judicial process under all circumstances.

> . . . . . .

> "The impediment that an absolute, unqualified privilege would place in the way of the primary constitutional duty of the Judicial Branch to do justice in criminal prosecutions would plainly conflict with the function of the courts under Art. III.

> . . . . . .

> "To read the Art. II powers of the President as providing an absolute privilege as against a subpoena essential to enforcement of criminal statutes on no more than a generalized claim of the public interest in confidentiality of nonmilitary and nondiplomatic discussions would upset the constitutional balance of 'a workable government' and gravely impair the role of the courts under Art. III.

> . . . . . .

> "A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately. These are the considerations justifying a presumptive privilege for presidential communications. The privilege is fundamental to the operation of government and inextricably rooted in the separation of powers under the Constitution.

> . . . . . .

> "But this presumptive privilege must be considered in light of our historic commitment to the rule of law. This is nowhere more profoundly manifest than in our view that 'the twofold aim [of criminal justice] is that guilt shall not escape or innocence suffer.' Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). We have elected to employ an adversary system of criminal justice in which the parties contest all issues before a court of law. The need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within

the framework of the rules of evidence. To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution *or by the defense.*" (Emphasis added.)

. . . . . .

"The right to the production of all evidence at a criminal trial similarly has constitutional dimensions. The Sixth Amendment explicitly confers upon every defendant in a criminal trial the right 'to be confronted with the witnesses against him' and 'to have compulsory process for obtaining witnesses in his favor.' Moreover, the Fifth Amendment also guarantees that no person shall be deprived of liberty without due process of law. It is the manifest duty of the courts to vindicate those guarantees and to accomplish that it is essential that all relevant and admissible evidence be produced.

"In this case we must weigh the importance of the general privilege of confidentiality of presidential communications in performance of his responsibilities against the inroads of such a privilege on the fair administration of criminal justice. The interest in preserving confidentiality is weighty indeed and entitled to great respect.

. . . . . .

"On the other hand, the allowance of the privilege to withhold evidence that is demonstrably relevant in a criminal trial would cut deeply into the guarantee of due process of law and gravely impair the basic function of the courts. A President's acknowledged need for confidentiality in the communications of his office is general in nature, whereas the constitutional need for production of relevant evidence in a criminal proceeding is specific and central to the fair adjudication of a particular criminal case in the administration of justice. With-

out access to specific facts a criminal prosecution may be totally frustrated.

. . . . . .

"We conclude that when the ground for asserting privilege as to subpoenaed materials sought for use in a criminal trial is based only on the generalized interest in confidentiality, it cannot prevail over the fundamental demands of due process of law in the fair administration of criminal justice. The generalized assertion of privilege must yield to the demonstrated, specific need for evidence in a pending criminal trial."

If we substitute the word "legislative" for the words "Presidential" or "executive", we see that the Supreme Court in deciding the "Nixon case" also decided the "Calley case".

The privilege claimed by the President was the generalized privilege of executive confidentiality. The privilege claimed by Congressman Hebert was the generalized privilege of legislative confidentiality.

The President sought to stand behind the doctrine of separation of powers. The Chairman of the House Subcommittee seeks to stand behind the doctrine of separation of powers.

The Supreme Court held that the executive branch was not entitled to invoke the privilege of confidentiality at the expense of the individual accused's right to evidence at his criminal trial. Here we hold that the legislative branch was not entitled to invoke the privilege of confidentiality at the expense of the individual accused's right to evidence at his criminal trial.

In *Nixon* the Court said the claim of executive privilege cannot prevail over the fundamental demands of due process of law. Here we say that the claim of legislative privilege must likewise fail for the same reason.

Clearly, the privilege of confidentiality claimed by Chairman Hebert of the House Subcommittee must give way to Calley's right to a fair trial. Nor is it an answer to say, as has been suggested

by counsel for the Respondents, that the evidence sought by the subpoena would have been "only cumulative". Obviously, the number of inconsistent statements—and not merely the inconsistencies themselves—may have an impact on those judging credibility. Also, how can we know that the evidence would have been only cumulative when we do not know what it was? Since access to the records has been refused it is impossible to know what the witnesses said. By the time the first subpoena was issued it was well known that the prospective prosecution witnesses had made statements that might have been exculpatory. Both the prosecution and the defense knew that Congress had conducted the investigation and had obtained several statements of a relevant nature made by prosecution witnesses. As a result of the Subcommittee's final report it was further known that some of these statements would qualify as prior inconsistent statements since the Subcommittee found inconsistencies in the testimony of two of the witnesses. The author of the article in the Yale Law Journal, above referred to in footnote 42, gave this appraisal of the situation:

"A judge would have to assume that such statements, being inconsistent with damaging testimony presented in court, might exculpate the defendant or mitigate his guilt. Given such knowledge, a court should not proceed with the case. Even if it were to strike the testimony of the relevant witnesses or prohibit them from testifying, the court would be unable to know whether exculpatory information in the undisclosed statements would put the case in a different light and lead to an acquittal. Surely the facts amount to suppression. The court's only preventive remedy certain to avoid violating the defendant's compulsory process and Brady due process rights would be to dismiss the case without prejudice. Although dismissal seems a drastic remedy, it is the only procedure by which a court faced with a non-disclosure of definitely or potentially exculpatory statements can avoid the risk of an impermissibly tainted conviction. Moreover, dismissal without prejudice permits the government to reconsider its decision not to disclose, allowing it to renew prosecution."
(pp. 1415, 1416.)

This conclusion is consistent with what the Supreme Court had said earlier in United States v. Reynolds, 345 U.S. 1, at 12, 73 S.Ct. 528, 534, 97 L.Ed. 727 (1953):

" . . . [T]he Government can invoke its evidentiary privileges only at the price of letting the defendant go free. The rationale of . . . [these] cases is that, since the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense."

Nor is the harm to the Defendant made less damaging by the fact that the prosecution also made futile good faith efforts to secure the evidence. If the evidence sought is material to the issues involved (as this evidence obviously was, and had been determined to be by the trial judge) both prosecution and defense are entitled to it, for in United States v. Nixon, supra, 418 U.S. at p. 709, 94 S.Ct. at p. 3108, 41 L.Ed.2d at p. 1064, the Court said:

"To insure that justice is done, it is imperative to the function of the courts that compulsory process be available for the production of evidence needed either by the prosecution *or by the defense.*"

The integrity of the judicial system, whether military or civilian, and the public confidence in that system depends upon full disclosure of all the facts relevant to the inquiry being made by the court. This public confidence will be greatly eroded unless the guarantees inuring to the benefit of the individual under the Fifth and Sixth Amendments are conscientiously observed by the

courts. In this case, where there was such a voluminous outcry on the part of the public, critical of the entire handling of the Petitioner's case,[48] it is absolutely necessary, if public confidence is to be maintained, that there be full disclosure of all of the relevant facts. Petitioner was tried for acts committed during a time of war in the midst of what was termed a combat assault. An entire task force, made up of three line companies, was involved in the operation. Yet, to date, only one stands convicted of any wrongdoing during the incident. That is the Petitioner. Throughout the entire proceedings the Petitioner has claimed that he was acting pursuant to the orders of his commander. The testimony of many witnesses at trial indicates that they believe that the Petitioner was doing just that.[49] There is some contradictory evidence as to what the exact order was that the Petitioner received. The order was, at best, ambiguous on its face and, at worst, an order to kill everyone found alive in the village of My Lai Four. The Secretary of the Army, in taking his clemency action in this case, expressed his belief that the Petitioner may well have conscientiously believed that he was doing what he was ordered to do. It is quite obvious that had a contrary order been given someone certainly would have taken steps to stop whatever happened at My Lai. No one did. The Army's own investigation headed by Lt. General Peers has not been released to the public. Moreover, an alleged White House investigation into the incident has not been released. Further non-disclosure of the facts surrounding this incident does not increase confidence on the part of the public in the administration of justice.[50] There is abundant evidence that the Petitioner did what he did fully believing that he was acting pursuant to the orders of his government and that he did what he did

believing that his acts were proper conduct of a soldier. At the very least there is certainly considerable question whether he committed the crime of murder in its classic sense. As was stated in the Petitioner's brief:

> The decision to obey or disobey the orders of his superior places the soldier in an unenviable position. This position becomes even worse when the soldier has never received any instruction concerning what he can and cannot do. Such was the dilemma in which the Petitioner found himself.

In these circumstances the courts which undertake to try and judge one so accused should hold inviolate his right to evidence which may prove helpful to his defense whether that evidence be exculpatory, excusatory, or such as might allow him to impugn those witnesses appearing against him. Mr. Justice Brennan's admonition bears repeating.

> When a congressional inquiry and criminal prosecution cross paths, *Congress must accommodate the public interest in legitimate legislative inquiry with the public interest in [seeing the witness gets] a fair trial.*

> Hutcheson v. United States, supra, 369 U.S. at 624, 82 S.Ct. at 1018.

And the same accommodation should occur when the Congress's legislative function invades the individual's right to a fair trial as a result of the appearance of a witness against the individual before the Congress. The suppression of possible exculpatory evidence by congressional fiat is just as harmful to the Petitioner as is the suppression of such by the prosecution. To hold otherwise would allow the Congress by its internal rules to usurp the judicial functions of the court. The Congress could just as easily convict an accused by such withholding of exculpatory evidence as it could if it passed an *ex post facto* law.

---

48. Of such proportion that the President deemed it wise to appear on national television to allay the fears of the people.

49. The Record of Trial reveals more than twenty instances of testimony in which individuals, other than the Petitioner, testified as to the giving of the order to kill women and children at My Lai.

50. Caesar's wife must be above suspicion. Plutarch, *Life of Julius Caesar*, x. 6.

Both are constitutionally condemned. Due process of law must mean, at the very least, a fair trial in a fair tribunal with full access to the relevant facts.

■ It is not necessary to belabor the point further. The teaching of United States v. Nixon, *supra*, can lead to but one conclusion and that is that the refusal of the House Committee to honor the court's subpoena resulted in the suppression of evidence material to Calley's defense and deprived him of due process, making his conviction constitutionally invalid.[51]

### III.

### THE NOTICE ISSUE

The Petitioner alleges that he was denied due process of law by being convicted on charges and specifications which were improperly drawn and illegally used by the government. He also contends that he was denied due process by the failure of the United States to adequately train and prepare him to disobey the order of his superior which he alleges brought · about his conviction herein. Both of these allegations are essentially contentions that he was deprived of the requisite notice required by the due process clause of the Constitution before conviction may be had.

The evidence of record in the case does not clearly indicate, one way or the other, whether Petitioner received adequate training concerning his duties. There is some evidence that he did not receive full benefit of the training necessary before being sent to a war zone. There is also indication that he did not receive instructions concerning the handling of prisoners or the requirement of the laws of war. The testimony of the Petitioner is ambiguous in this regard and there was no evidence presented by the government covering Petitioner's training. Neither the Court of Military Review nor the Court of Military Appeals addressed this issue. Had they

done so they might have appropriately ordered a remand of the case for enlargement of the record.

■ If indeed the Army did fail in its responsibility to adequately instruct and prepare the Petitioner for action or nonaction pursuant to an illegal order, it appears to me that a question of due process would certainly be raised. The Petitioner's superior officer acted with the full authority of the United States in his relations with the Petitioner. The acts of such an officer are the acts of the government where such acts lead to a deprivation of due process. Neal v. Delaware, 103 U.S. 370, 26 L.Ed. 567 (1880). For the government to compel one to commit an act at his peril without any warning of the peril is certainly violative of due process of law. Railroad Commission v. Eastern Texas Railway Company, et al., 264 U.S. 79, 44 S. Ct. 247, 68 L.Ed. 569 (1924). The Constitution of the United States guarantees to our citizens certain rights that the laws of other nations do not guarantee to their citizens. There is validity in the Petitioner's argument that "just as governmental power is circumscribed by the laws of war embodied in the Geneva Convention and as understood in the law of nations, the individual nation has the duty to circumscribe the actions of its own individual soldiers. This circumscription places on the government a dual obligation: (1) Not to order the individual to act illegally and (2) To train the individual as to what action may be .considered illegal even in the face of orders from his government." If the United States failed, through Captain Medina, in the first of its obligations, it would seem to be a requisite of fairness that the United States not fail in the second. Absent an adequate record, this Court makes no determination with regard to this question.

A much more obvious problem of notice appears in the matter of the charges

---

51. It should be noted that neither the Court of Military Review nor the Court of Military Appeals had the benefit of the guidance pro-

vided in the *Nixon* decision at the time the Calley case was being reviewed.

preferred against the Petitioner. He alleges that he was not given notice adequate to allow him to prepare his defense either by the charges and specifications as they were drawn or by the bill of particulars ordered by the military judge.

 Notice of charges with such specificity so as to allow the accused to defend against those charges is an inherent ingredient of due process of law. Ungar v. Sarafite, 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964); Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L. Ed.2d 556 (1972); McKeiver v. Pennsylvania, 403 U.S. 528, 91 S.Ct. 1976, 29 L. Ed.2d 647 (1971). The test as to whether one accused of crime is given adequate notice in a charge against him is whether the charge is definite and specific enough to meet the test of reasonably apprising the accused of what he must defend against and enable him to avoid a second conviction for the same offense or included offenses. The specifications against the Petitioner alleged multiple killings. Specification 1 of the charge alleged a multiple killing of not less than thirty individuals of no specific age or sex. Specification 2 alleged the killing of not less than 70 individuals of no particular age or sex. The prosecution did not identify any individual as being one that the Petitioner killed or ordered to be killed nor did the bill of particulars otherwise identify any individual the Petitioner was supposed to have killed. While the bill of particulars delineated a general location of the alleged killings, it did not allege any identifying characteristics of the individuals. Even the locations were general in nature such as "somewhere in the Eastern portion of the village" and in the vicinity of the "southern edge of the village".

What is involved here is not just a question of multiplicity or duplicity in pleading. Rather it is a question of whether the notice required by due process of law was present. Article 118 of the Uniform Code of Military Justice states, in the singular, that any person subject to this chapter who without justification or excuse unlawfully kills *a human being*, when he has a premeditated design to kill, is guilty of murder. Neither the research of the parties nor that of this Court reveals any military or federal cases, other than this case, allowing an offense to be alleged covering multiple unnamed victims in a single specification. Those cases cited by the Petitioner and by the government dealing with multiple victims within an indictment deal with individuals who were specifically recognizable. See People v. Alibez, 49 Cal. 452 (1875); Ramsey v. State, 33 Ga.App. 77, 125 S.E. 777 (1924); State v. Batson, 108 La. 479, 32 So. 478 (1902); Nixon v. Alabama, 268 Ala. 101, 105 So.2d 349 (1958); Ben v. State, 22 Ala. 9 (1853); State v. Morrison, 184 La. 39, 165 So. 323 (1936); State v. Ayers, 70 Idaho 18, 211 P.2d 142 (1949); Wilkinson v. State, 77 Miss. 705, 27 So. 639 (1900); Cornell v. State, 104 Wis. 527, 80 N.W. 745 (1899). The question of constitutionally required fair notice and due process was not present in those cases due to the fact that the victims in each case were readily identifiable and the defense could be made aware of such identities.

In this case the testimony indicated that there were several various and separate acts allegedly committed by the Petitioner and by others over a period of some few hours. Not all of the people identified by any one individual who testified with regard to the charged multiple killings were alleged to have been killed by the Petitioner alone. No one pointed out any particular individual within the group depicted in prosecution Exhibit 12 (the photograph) as being one killed by the Petitioner or at his direction. There was, similarly, no specific time frame given by the prosecution as to when the killings took place, and as a result the Petitioner could have been convicted of the crimes charged without there being an agreement on the part of the jurors as to time, identity, location, or even number. This raises a problem of unique character, at least as

far as American jurisprudence is concerned—the problem of possible double jeopardy *within the same criminal proceeding.*

The Fifth Amendment to the Constitution, in addition to requiring notice under the due process clause provides, in pertinent part:

"Nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb."

Protection against double jeopardy is a fundamental right incorporated in the American system of justice. Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). This fundamental right protects against the "risk" or "potential" that an accused may again be convicted of the same offense for which he was initially tried. Price v. Georgia, 398 U.S. 323, 90 S.Ct. 1757, 26 L.Ed.2d 300 (1970). Multiple conviction and punishment for the same offense is prohibited. United States v. Coke, 404 F.2d 836 (2 Cir. 1968). Jeopardy attaches when the jury is impaneled and sworn, United States v. Fancher, 323 F. Supp. 1069 (D.C.S.D.1970) and the prohibition forbids double punishment for what is the same offense, not *eo nomine*, but the same transaction. Johnson v. Rhay, 266 F.2d 530 (9 Cir. 1959).

While the idea of double jeopardy normally arises from an accused's involvement in two proceedings, Green v. United States, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957); Downum v. United States, 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963), it is not necessary that there be two proceedings before jeopardy can attach twice. State v. Inzitari, 6 Conn.Cir. 170, 269 A.2d 35 (1969).

In this case there was indeed a risk (even a probability) that the Petitioner was twice convicted for the same individual killing within the same trial. The risk is illustrated aptly by the hypothetical as to Specification 2 presented by the Petitioner both in his brief and on oral argument.

The following hypothetical will illustrate. Suppose that an accused is charged with the premeditated murder of unnamed human beings A, B, C, D, E, and F, sex and age unknown, in one charge and of X and Y, unnamed human beings, sex and age unknown, in the second charge. These murders are alleged to have occurred in the same general location in a small village. The proof adduced at trial shows that this location was, in fact, the same location, a ditch. Moreover, the witnesses who identify or number those in the first charge saw the bodies of those in the second charge among those counted in the first group. Certainly, it would be improper for the jury to find that X was in fact B and Y was D and return a finding of guilty as to both charges. Such would subject the accused to double jeopardy because the accused was convicted of killing B twice and D twice. The same would be true if the jury, by exceptions and substitutions, had found the accused guilty of the murder of A, B, D and F in the first charge since those unidentifiable persons excepted from the findings were not shown to be X and Y.

No witness who testified at trial separated the bodies at the ditch when they made their estimates of the number. There is no indication as to how the court members separated the victims if, in fact, they did so. Thus, the possibility exists that the Petitioner was subjected to being twice put in jeopardy for the same offense. Similarly, without some means of identification, there is no way to know that the jurors were in agreement as to the identity of the "one" of the alleged victims in Specification 1 for whose death the Petitioner should be held responsible.

Since the news media told the world that this "murdering monster" could have been involved in the killing of as many as 600 "innocent civilians", and considering the predilection of some to make Calley responsible for everything that happened in Vietnam, it is not in-

conceivable that further charges may be brought against him in some tribunal accusing him of the murder of "578 individuals of no specific age or sex" (or the "victim" *might even be specified*); how would it then be known by the accused whether he had already been convicted for the murder of 22 of them, since the "persons" alleged to be the victims of the murders for which he *has been* convicted are not identified in the specification or bill of particulars?

 The constitutionally mandated notice was not present in this case to enable the Petitioner to know what he had to defend against and to protect him from double jeopardy.

## OBITER

It is appropriate to remember that the Petitioner was sent to participate in a war where the enemy was as frequently clothed as civilians as in military uniform.

It is also appropriate to keep in mind that war is war and it is not at all unusual for innocent civilians to be numbered among its victims. It has been so throughout recorded history. It was so when Joshua took Jericho in ancient Biblical times.

> "And they utterly destroyed all that was in the city, both man and woman, young and old . . . with the edge of the sword."[52]

Now Joshua did not have charges brought against him for the slaughter of the civilian population of Jericho. But then "the Lord was with Joshua", we are told.

> "So the Lord was with Joshua; and his fame was noised throughout all the country."[53]

When Russian troops occupied the Polish border city of Polotsk in 1565

Ivan the Terrible ordered the entire Jewish civilian population drowned.

In World War II Churchill ordered the RAF night-time saturation bombing of German cities, and Eisenhower had his bomber armada carry on the slaughter by day. Approximately a half million Germans were killed and a large percentage of this number were women and children. Yet Churchill was acclaimed as the great man of the Twentieth century and Eisenhower was twice elected President. Then Truman bombed Hiroshima, leaving 80,000 dead, most of whom were women and children, but he was later elected President. The airmen who dropped the bombs got medals and honorable discharges.

General Sherman said "War is Hell" and as he marched through Georgia to Union sainthood he proved it by explicitly and sardonically mocking the West Point canons that condemn atrocities, calling the canons "old notions". He said, "War is cruelty, and you cannot refine it". In his view the mission of the Army was to kill, burn, mangle and destroy, and in a memorandum to President Lincoln he urged a policy of ruthlessness, contending that the war must go on until "enough" southern landowners (innocent civilians) were killed off. He did not hesitate to invoke terror. He wrote, "To secure the navigation of the Mississippi River I would slay millions; on that point I am not only insane, but mad."[54]

When the Mayor of Atlanta pleaded with Sherman that if he forced the evacuation of the city hundreds of innocent women and children would starve in the woods Sherman readily agreed, saying:

> "I give full credit to your statements of the distress that will be occasioned. [But] my orders are not designed to meet the humanities in the case."

52. The Holy Bible, Joshua 6:21 (King James Version).

53. Ibid., 6:27.

54. On November 28, 1969 the CBS network news commentator, in talking about Calley and My Lai, made this unctuous pronouncement: "Deliberate terrorization of civilians is against, not part of, our national policy of war."

He put the torch to Atlanta and burned it to the ground, then ordered his troops to scorch a corridor 30 miles wide to the sea. Referring to this operation Carl Sandburg asks:

"What was it other than a human conflagration, a wide-moving cyclone, a plague of locusts, a cloud of giant biped grasshoppers, an Old Testament visitation of the vengeance of Jehovah or the raucous laughter of hell-hounds spawned from the cesspools of demoniac nether regions?"

Then with regard to Sherman (who he described as "The Terrible") he poses this question:

"Was Sherman a modern impersonator of Attila the Hun, a manner of sadist, a wanton and a monster who took pleasure in seeing an enemy people suffer? Or was he a soldier doing a necessary job?"[55]

Sherman was a barbarian and he was proud of it. Of the Georgia campaign he later said:

"No doubt many acts of pillage, robbery and violence were committed."

And when he reached Savannah he wrote his wife:

"They (the Georgians) regard us just as the Romans did the Goths and the parallel is not unjust."

He refused to set up a military police unit to watch and discipline his own men because to have done so would have "delayed the operation" and he excused the atrocities committed by his troops with this comment:

"This may not be good morality, but is war."

Sherman waged war with admitted calculated cruelty and he did so with the grateful blessings of his commander in chief, who did not suggest that he be court-martialled, but instead sent him the following message when he reached Savannah:

"God bless you and the army under your command."

And he was not condemned from the podium and the pulpit, but he was instead glorified, idolized, beatified and sanctified. In 1884 he barely escaped being nominated for President.

The point is that Sherman was absolutely right; not about what he did, but about the nature of war; war *is* hell, and when we take a young man into the Army and train him to kill and train him to take orders and send him into a strange foreign land to follow the flag, and he then in the wild confusion of combat commits an act which, long after the event, is made the basis of a capital criminal charge, simple justice demands that he be treated fairly by the press, by his government and by the branch of the service in which he served. Sadly, it must be admitted that Calley was not accorded such consideration. Quite the contrary.

He was pummelled and pilloried by the press.

He was taunted and tainted by television.

He was reproached and ridiculed by radio.

He was criticized and condemned by commentators.

His commander in chief publicly aligned himself with the prosecution.

His government denied him access to evidence.

His pleas to the Department of Justice went unanswered.

His conviction was to be a cathartic to cleanse the national conscience and the impellent to improve the Army's image.

His country not only denied him a fair trial—it even denied him a fair chance for a fair trial.

## JUDGMENT

It is the judgment of the Court that the Petitioner in his trial by court-martial was not accorded due process of law in the respects referred to in Sections I,

55. Carl Sandburg's "Abraham Lincoln", Vol. 5, pages 25, 620 and 621 (Sangamon Edition).

IIA, IIB and III of the Court's opinion filed this date, and that his conviction thereby obtained is constitutionally invalid and that he is, therefore, entitled to the relief sought in his habeas corpus petition.

Accordingly it is ordered that the Petitioner be released forthwith from his present confinement in the United States Disciplinary Barracks at Fort Leavenworth, Kansas, and that he be discharged from custody or restraint of any nature. It is further ordered that the Respondents take such action as may be necessary to comply with this directive.

The Court retains jurisdiction of this matter for the purpose of entering such further orders as may be found necessary or appropriate.